717 So.2d 1284 (1998)
William David RAKESTRAW, Appellant,
v.
Rebecca Kay RAKESTRAW, Appellee.
No. 96-CA-01118 COA.
Court of Appeals of Mississippi.
April 21, 1998.
Rehearing Denied July 28, 1998.
*1285 T.K. Moffett, Tupelo, for Appellant.
Charles R. Wilbanks, Corinth, for Appellee.
Before THOMAS, P.J., and COLEMAN and HINKEBEIN, JJ.
HINKEBEIN, Judge, for the Court:
¶ 1. William Rakestraw brings this appeal from the Alcorn County Chancery Court's judgment of divorce entered against him and in favor of his wife of 25 years, Rebecca Rakestraw. The sole basis for his appeal is that the chancellor erred in awarding the divorce in favor of Mrs. Rakestraw on the ground of habitual cruel and inhuman treatment. Mrs. Rakestraw cross-appeals, characterizing the chancellor's failure to require that her husband pay support for the benefit of the couple's three minor children as an unacceptable deviation from statutory guidelines.

FACTS
¶ 2. William and Rebecca were married on June 25, 1972. Taking only the verifiable portions of Rebecca's trial testimony into consideration, difficulties apparently arose shortly thereafter. By his own admission, William held upwards of thirty-five separate jobs over the course of the relationship. Few of these money-making ventures allowed William to contribute in any significant way to his growing family's financial needs. Worse yet, due to an apparent lack of initiative on William's part, this frequent "jobhopping" was punctuated with lengthy periods of unemployment. Adding to the adversity, William, against Rebecca's wishes, brought his mentally ill brother to live with the family upon his release from the Mississippi State Hospital at Whitfield. Since her modest teacher's salary failed to provide sufficient funds to support the entire group, Rebecca and her children were often left to survive without what would seem to be necessities in this day and age. For example, when the older appliances in her home ceased working, she managed to sustain the family for nearly a year without the aid of either a refrigerator or stove. After Rebecca's sympathetic relatives finally purchased these units, William became upset with what he considered their interference and left the premises while the items were unloaded.
¶ 3. William's neglect touched other aspects of the marriage as well. Beyond the lack of monetary aid and resulting hardships, William refused entirely to assist with household chores. As Rebecca's sister recalled at trial, even during the earliest days of the marriage, "if Becky and Bill came in to visit... she brought in the luggage, she brought *1286 in the babies, she took care of everything." Without belaboring the details of each occasion on which he exhibited such neglect, suffice it to say that this pattern apparently continued for the next two and a half decades. Moreover, the exterior of the family home, which Rebecca left to William's care, remained in a constant state of clutter and disrepair according to all accounts. During these years William also withheld emotional support from Rebecca as well as their daughters. His indifference can be most clearly identified in an unwavering refusal to attend functions such as holiday gatherings and childhood recitals/programs. The most glaring examples of this non-attentiveness are William's unexplained failure to appear at either his wife's college graduation or his oldest daughter Lydia's high school graduation ceremonies.
¶ 4. William's familial role was not entirely passive, though. He frequently belittled Rebecca before family and friends by referring to her as "stupid" or "ignorant." While Rebecca admitted to occasionally returning these insults, his unkind behavior extended beyond mere bickering. Although there is no confirmation that he ever struck his wife, William was prone to throwing household items about during what might best be described as temper tantrums. And his hostility was directed at the entire family, not merely his wife. During one of these episodes he questioned the paternity of the youngest daughter. In the midst of another, he accused the oldest child of causing his marriage to deteriorate.
¶ 5. In July of 1995, the deaths of their parents left Rebecca and her sister as joint owners of the home in which they had grown up. Rebecca saw a previously unimaginable opportunity to become a homeowner, thereby ending the constant threat of eviction which had long plagued her family. After the two siblings arrived at a workable and mutually agreeable method by which her sister's onehalf interest in the home might be purchased, Rebecca and her children moved in. But, for unknown reasons, William remained behind. Apparently the choice was his own, as Rebecca repeatedly asked that he join the family. In fact, during the next several months she invited him into the home on numerous occasions for the purpose, among other things, of engaging in sexual relations. But with the altered perspective gained from the additional distance between them, her affection for him apparently waned. As a result, in early March 1996, Rebecca revoked the permission she had previously given William to come onto the premises and informed him of her intention to end the marriage.
¶ 6. At trial, Rebecca and various witnesses appearing on her behalf described William's subsequent behavior as "stalking." In turn, William characterized his actions as attempts to reconcile the relationship. Regardless of the term used, he continued to appear at the home with great frequency. Although William had long frustrated attempts by Rebecca's sister to retrieve certain furnishings from his residence, he suddenly began arriving with the pieces loaded onto his truck. On two separate occasions, he damaged the items by shoving them from the vehicle onto the drive. Even more disturbing to Rebecca, he spent many hours either sitting nearby in his parked vehicle or driving past the house, waiting for her and the girls to step outside. At one point his late night knocks at her door and peeping through open windows caused Rebecca to fear for the safety of her family. Fortunately though, whether in response to law enforcement warnings or his acquiescence in the impending end of his marriage, this behavior dwindled as the summer drew to a close. Then on August 28, 1996, the final judgment of divorce was granted.

ANALYSIS

I. DID THE CHANCERY COURT DECREE DIVORCE WITHOUT EVIDENCE OF HABITUAL CRUEL AND INHUMAN TREATMENT?
¶ 7. Without substantial challenge to these facts, William argues that they fall short of the habitual cruel and inhuman treatment found by the chancellor below. In doing so he meets each of the individual complaints made by Rebecca with case law that suggests reversal. However, Rebecca responds by urging this Court to consider the actions described not in isolation but as a whole, wherein an unrelenting pattern may be seen. Since we too believe this to be the proper *1287 viewpoint from which to examine William's behavior, we leave the decree undisturbed.
¶ 8. Habitual cruel and inhuman treatment may be established by a showing of conduct that either (1) endangers life, limb, or health, or creates a reasonable apprehension of such danger, rendering the relationship unsafe for the party seeking relief, or (2) is so unnatural and infamous as to make the marriage revolting to the non-offending spouse and render it impossible for that spouse to discharge the duties of marriage, thus destroying the basis for its continuance. Daigle v. Daigle, 626 So.2d 140, 144 (Miss.1993); Gardner v. Gardner, 618 So.2d 108, 113-14 (Miss.1993). Although the cruel and inhuman treatment usually must be shown to have been `systematic and continuous,' see Robinson v. Robinson, 554 So.2d 300, 303 (Miss.1989), a single incident may provide grounds for divorce. Ellzey v. Ellzey, 253 So.2d 249, 250 (Miss.1971). The requisite behavior may be established by a preponderance of the evidence, and the charge "means something more than unkindness or rudeness or mere incompatibility or want of affection." Daigle, 626 So.2d at 144 (quoting Smith v. Smith, 614 So.2d 394, 396 (Miss.1993)).
¶ 9. Before examining the chancellor's decision, we must establish the standard of review to which we are bound. Established precedent permits the chancellor, as the trier of fact, to evaluate the sufficiency of the proof based upon his assessment of the credibility of the witnesses and the weight he thinks properly ascribed to their testimony. Rainey v. Rainey, 205 So.2d 514, 515 (Miss. 1967). This Court's scope of review is thereafter limited. Ferguson v. Ferguson, 639 So.2d 921, 930 (Miss.1994). We may well overturn a chancellor's determination only when the findings are manifestly wrong and there is no substantial supporting evidence. Daigle, 626 So.2d at 144; Lenoir v. Lenoir, 611 So.2d 200, 203 (Miss.1992). "This is particularly true `in the areas of divorce and child support.'" Ferguson, 639 So.2d at 930 (quoting Nichols v. Tedder, 547 So.2d 766, 781 (Miss.1989)). Therefore we must be ever mindful that the chancellor, in this case, on largely uncontroverted proof, found as a matter of fact that William's conduct, over the necessarily protracted period, rose to the level necessary of habitual cruel and inhuman treatment within the meaning of the statute. See Miss.Code Ann. § 93-5-1 (Rev.1994).
¶ 10. In his attempt to demonstrate manifest error William wisely notes the increased precision with which the Mississippi Supreme Court has examined such cases in recent years. Following our legislature's 1976 establishment of irreconcilable differences as an alternative, the court has reversed many divorces granted on grounds of habitual cruel and inhuman treatment. As William is quick to point out, certain facts described in those opinions are reminiscent of the behavior he exhibited during the course of his marriage. For example, in Gallaspy v. Gallaspy, 459 So.2d 283 (Miss. 1984), the court determined that the test for habitual cruel and inhuman treatment had not been met where a husband constantly criticized his wife, withheld praise and support from his children, and placed a higher priority on his parents' estates than his marriage. Gallaspy, 459 So.2d at 285. In Kergosien v. Kergosien, 471 So.2d 1206 (Miss. 1985), a wife's financial irresponsibility and abandonment of family duties, even when considered in light of occasional "acts of cruelty" directed at the children, did not justify the granting of a divorce upon the grounds of habitual cruel and inhuman treatment. Kergosien, 471 So.2d at 1208, 1210. Similarly, continued embarrassing financial practices peppered with perceived verbal and psychological abuse failed to suffice in Wilson v. Wilson, 547 So.2d 803, 804 (Miss.1989). And subsequently, in Daigle v. Daigle, 626 So.2d 140 (Miss.1993), the supreme court affirmed the denial of a husband's petition for divorce based on his wife's lack of intimacy, "constant hassling," and isolated outbursts of rage. Daigle, 626 So.2d at 144. Moreover, although incidents occurring after the parties have separated may theoretically form an adequate basis for granting the divorce, see Bias v. Bias, 493 So.2d 342, 344 (Miss.1986), the failure to return and/or destruction of an estranged spouse's personal property during that interval does not meet the standard required for a divorce on the basis of cruel and inhuman treatment. Day v. Day, 501 So.2d 353, 355-56 (Miss.1987). Though this body of law may initially suggest reversal, a *1288 closer examination of the circumstances bring the chancellor's reasoning into focus neither William nor this Court, aside from the case sub judice, has uncovered a case wherein each of these practices appear simultaneously. In addition to the admitted hardship imposed on parties via these decisions, our supreme court has specifically noted, "[t]here are many kinds of acts such as wilful failure to support, verbal abuse, neglect, and the like which, if taken alone will not constitute cruelty, but when taken together will manifest a course of conduct as a whole which may amount to cruelty." Savell v. Savell, 240 So.2d 628, 629 (Miss.1970) (comparing adequacy of acts similar in nature with those that, although varying in character, cause suffering on part of innocent spouse when displayed in combination). See also Sandifer v. Sandifer, 215 Miss. 414, 61 So.2d 144 (1952); Smith v. Smith, 40 So.2d 156 (Miss.1949); Manning v. Manning, 160 Miss. 318, 133 So. 673 (1931). Because the whole of William's behavior was so consistently egregious over the entire 25 year relationship, we cannot fault the chancellor's opinion that this was one such situation.
¶ 11. William also cites Fournet v. Fournet, 481 So.2d 326 (Miss.1985), wherein it was held that a spouse seeking divorce on the ground of habitual cruel and inhuman treatment must offer proof as to causal connection between the cruel treatment complained of and his/her separation from the household. Id. at 329. He alleges a resulting deficiency in Rebecca's proof since her separation from him was initially induced not by his behavior, but rather by her own desire to become a homeowner. However, he fails to consider that the proximate cause rule of Fournet has since been limited as follows:
Absence of proof of proximate cause does not in logic negate the reality of habitual cruel and inhuman treatment, which may indeed have been a proximate cause of harm to the health and physical well being of the plaintiff (as distinguished from the actual cause of the separation). The chancellor's primary inquiry must in justice be into the ground for divorce. That inquiry requires a dual focus: upon the conduct of the offending spouse and the impact of that conduct upon the plaintiff. If the requisite impact upon plaintiff is proved, there is little reason why we should arbitrarily dismiss because of the proximate cause of separation rule which no legislature has mandated.
Bias, 493 So.2d at 345. Subsequent to this retreat, in Faries v. Faries, 607 So.2d 1204 (Miss.1992), the court provided further guidance on the issue. While holding the chancellor in error for dismissing a wife's complaint for divorce, Justice Banks explained that the mandatory harm may consist of damage to the complaining spouse's mental health, not only physical. Faries, 607 So.2d at 1209. Relying in part on a clinical social worker's confirmation of Mrs. Faries' mental instability, the court found a satisfactory nexus between her husband's abuse and her own depression and low self-esteem. Id. See also Muhammad v. Muhammad, 622 So.2d 1239, 1250 (Miss.1993) (overlooking lack of specific, immediate provocation for wife's decision to end marriage where, after two years, she simply stole away during night as her husband slept).
¶ 12. In the instant case, the chancellor found, as a matter of fact, that from a subjective standpoint, the proof was sufficient to show that the conduct of Mr. Rakestraw had the necessary adverse impact on his wife's physical and emotional well-being to justify severing the marital relationship. There is enough evidence before us to support this finding, and there is, therefore, no basis to disturb the judgment. The record reveals an undisputed pattern of psychological abuse as well as gross neglect, financial and otherwise, resulting in persistent emotional stress for Rebecca as well as her children. Rebecca's claims, as confirmed by friends, family, and in some instances corroborated by William's own testimony, establish the necessary link between her husband's behavior and her own emotional deterioration which led to her leaving the marriage. This assignment of error is therefore without merit.

II. DID THE TRIAL COURT ERR BY FAILING TO ORDER PAYMENT OF CHILD SUPPORT?
¶ 13. Turning to Rebecca's crossappeal, there is no question that the couple's three daughters, one of whom is currently enrolled in college, are in dire need of financial *1289 support from their father. As a teacher Rebecca earns approximately $27,000 per year and must depend on assistance from various friends and family members in order to properly provide for herself and the three girls. Her request that William be ordered to pay the 22% of his adjusted gross income suggested by statute is reasonable. Mississippi Code Annotated § 43-19-101(1) (Rev. 1993). However, Rebecca fails to notice that the provision merely creates a "rebuttable presumption ... regarding the awarding or modifying of child support awards...." Miss.Code Ann. § 43-19-101(2). Application of the guidelines can be circumvented by a chancellor's on the record finding that their effect would be unjust. Id. See also Dufour v. Dufour, 631 So.2d 192 (Miss.1994) (reversing for lack of express, written rationale for non-compliance). As the Mississippi Supreme Court has written:
Certainly the guidelines are relevant and may be considered by a chancellor as an aid, but the guidelines may not determine the specific need or the specific support required. This is to be done by a chancellor at a time real, on a scene certain, and with a knowledge special to the actual circumstances and to the individual child or children.
Thurman v. Thurman, 559 So.2d 1014, 1017-18 (Miss.1990). (citations omitted). Moreover, the statute impliedly advocates such action where the non-custodial parent's income falls outside the typical range above $50,000 or less than $5,000 annually. Miss. Code Ann. § 43-19-101(4).
¶ 14. In the instant case, William's annual earnings from the Army National Guard amount to a mere $2,160. As his final written judgment implies, the chancellor considered this situation to be sufficiently severe as to warrant departure from the usual method of support calculation. We have no quarrel with his statutory authority to make such a determination. See Grogan v. Grogan, 641 So.2d 734 (Miss.1994) (affirming similar action based on chancellor's written explanation of reasons for such); Ferguson v. Ferguson, 639 So.2d 921 (Miss.1994) (affirming courtmandated support in excess of statutory recommendations where record established parent's ability to pay more). However, the chancellor failed to follow the required method for doing so.
¶ 15. Rather than issuing specific findings of fact or conclusions of law, the chancellor addressed the child support issue as follows: "Because the proof established that William David Rakestraw only earns the sum of $180.00 per month from his only employment at the present time with the Army National Guard, no child support will be set but will be held in abeyance pending William David Rakestraw's future employment." Though there is nothing inherently wrong with this conclusion, its glaring brevity is in conflict with Mississippi case law. Section 43-19-101(2) requires a "written finding or specific finding on the record that the application of the guidelines would be unjust or inappropriate... as determined under the criteria specified in § 43-19-103" in order to effectively overcome the statutory presumption. Miss.Code Ann. § 43-19-101(2). Similarly, § 43-19-101(4) reads in part, "the court shall make a written finding in the record as to whether or not the application of the guidelines established" is reasonable. Miss.Code Ann. § 43-19-101(4). (emphasis added). Our supreme court has held that these provisions, operating in conjunction, at a minimum require some written reference to the guidelines being bypassed and some explanation as to why. Knutson v. Knutson, 704 So.2d 1331, 1334 (Miss.1997). See also Johnson v. Johnson, 650 So.2d 1281 (Miss. 1995) (chancellor must use statutory percentages as baseline). Clearly, no such language appears in the Opinion and Judgment issued below. We therefore must reverse and remand on this issue.
¶ 16. THE JUDGMENT OF THE ALCORN COUNTY CHANCERY COURT IS AFFIRMED IN PART AND REVERSED IN PART FOR PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION ON REMAND. COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
BRIDGES, C.J., McMILLIN and THOMAS, P.JJ., and KING and SOUTHWICK, JJ., concur.
*1290 PAYNE, J., concurs in part and dissents in part with a separate written opinion joined by COLEMAN, DIAZ and HERRING, JJ.
PAYNE, Judge, concurring in part, dissenting in part:
¶ 17. Although I concur with the majority in regard to the grounds for divorce and in the granting of the divorce, I cannot agree that the chancellor was correct in failing to order any payment of child support. None of the cases cited as authority for upholding the chancellor's discretionary ruling were cases which absolved a man entirely from supporting his offspring. Granted, a chancellor may in his discretion depart from the guidelines if the circumstances so warrant. Miss.Code Ann. § 43-19-101(2) (Rev.1993). However, I believe that "departing from the guidelines" is decidedly different from an absolute refusal to recognize the need for support. After all, it is the law in this State that parents have an obligation to support their children. Alexander v. Alexander, 494 So.2d 365, 368 (Miss.1986) ("Duty to support children is upon both parents and it is a continuing duty, both legal and moral in nature, and a vested right of the child growing out of a marriage relation.").
¶ 18. In the present case, we have William, a man who for twenty-five years has succeeded in not supporting his family. The facts suggest that William frequently hopped from job to job (holding upwards of thirty-five jobs during his marriage, most of which did not consist of money-making ventures sufficient to permit him to contribute to the support of the family) which was further exacerbated by lengthy periods of unemployment in-between jobs. Furthermore, there is no evidence whatsoever that William is unable to work. As a matter of fact, in the trial below, William readily offered into evidence his $180 per month salary from his employment with the Army National Guard. This evidence more than anything indicates that William is perfectly capable of earning a living but has chosen to remain unemployed at the expense of his children. The chancellor instead of looking upon this man's refusal to support his family with disdain, rewarded him by refusing to order child support until such time as he becomes gainfully employed. Common sense should tell us that William now, more than ever, has no reason to become gainfully employed.
¶ 19. Such a ruling is certainly against public policy. If we look at the statutory scheme of recent years, we will find that public policy against non-support of one's offspring is well documented. For example, there has been a concerted effort to locate deadbeat dads to the extent that licenses can now be withheld if child support has not been paid. Miss.Code Ann. § 93-11-155 (Supp. 1997). Those owing child support cannot receive income tax refunds without first deducting monies owed for the child. Miss Code Ann. § 43-19-31(h) (Supp.1997) & § 27-7-507 (Rev.1991). One cannot even become a "new hire" on a job without having his name sent to the Department of Human Services. Miss.Code Ann. § 43-19-46 (Supp. 1997). In fact, the criminal law has long made it a felony (in that one could be sent to the penitentiary for up to five years on a first offense) to fail to support one's children who are under the age of sixteen. Miss.Code Ann. § 97-5-3 (Supp.1997). The laws which govern child support questions in divorce situations hold that a parent will support the child during his minority or until he is emancipated, whichever comes first. Crow v. Crow, 622 So.2d 1226, 1230 (Miss.1993). The welfare department now has the power and authority to go after a non-supporter with a vengeance if the State has donated tax dollars for the support of the children. Miss. Code Ann. § 43-19-31 (Supp.1997). Clearly, our public policy does not dictate that we ignore a parent's potential earning capacity and let him off the hook merely because he chooses not to work. When a parent is ordered to pay child support, our case law does not allow him to modify his obligation merely because he chooses not to work. Varner v. Varner, 666 So.2d 493, 497 (Miss.1995). How can we, therefore, advocate a situation such as the one before us.
¶ 20. In the present case, we have a mother who has striven diligently to support herself and her family on her meager salary as a public school teacher, and because her husband was "between jobs" when the case was tried, he is absolved from any duty to support his minor children. I would not hold the matter of child support in abeyance until *1291 such time as this father decides to go to work. I would follow the guidelines and award child support equal to twenty-two percent of the father's income, whatever it is, and demand proof of compliance by having him file copies of pay stubs with the court on a regular basis. Under the "new hires" law, that information could be available to the Department of Human Services with whom the chancery court already has a basis for cooperation. By ordering William to pay child support from the beginning, we place the burden on him (where it rightfully deserves to be) to prove that he cannot comply with the child support order already in place. Thus, it would not be the mother's duty to "catch" him gainfully employed at which time she would have to hire a lawyer to move for modification of the child support order in the hopes of finding money that William had not already spent.
¶ 21. As a final aside, I would point out that many states have codified the right of the court to order child support based on earning capacity. See Othman v. Hinman, 55 Cal.App.4th 988, 999, 64 Cal.Rptr.2d 383, 389 (Ca.1997) ("As long as ability and opportunity to earn exists ... the court has the discretion to consider earning capacity when consistent with the child or children's best interests."); In the Matter of the Marriage of Johnson and Johnson, 24 Kan.App.2d 631, 950 P.2d 267, 270 (1997) ("Under the Kansas Child Support Guidelines ... income may be imputed to the noncustodial parent if that parent is deliberately unemployed or underemployed."); Bennett v. Commonwealth, 22 Va.App. 684, 472 S.E.2d 668, 672 (1996) ("A trial court has discretion to impute income to either or both the custodial or noncustodial parent who is voluntarily unemployed...."); Kowalski v. Kowalski, 806 P.2d 1368, 1370 (Alaska 1991) ("[T]he Commentary to Civil Rule 90.3 clearly states that the trial court may calculate child support based on "potential income" if the obligor parent is found to be voluntarily unemployed or underemployed."). While I believe our courts now have the authority under public policy to look at earning capacity in determining child support awards, I might suggest that we follow the lead of other states and make this authority statutory, thus, leaving no doubt as to a deliberately unemployed parent's obligation to his children.
COLEMAN, DIAZ and HERRING, JJ., join this separate written opinion.