BARNES, J., for the Court.
¶ 1. M.W.F. argues that the lower court’s findings of fact were insufficient to grant his wife a divorce on the ground of habitual, cruel and inhuman treatment. Based on a review of the evidence adduced at the hearing, we find that the chancellor did not commit manifest error in awarding D.D.F. the divorce. The judgment of the Chancery Court of Greene County is, therefore, affirmed.
STATEMENT OF FACTS AND PROCEDURAL HISTORY
¶ 2. D.D.F.[1] filed her complaint for divorce against her husband M.W.F. on February 25, 2003. The parties had been lawfully married for eighteen years and had two daughters, aged seventeen and fifteen. D.D.F. sought a divorce on the ground of habitual, cruel and inhuman treatment. The matter came on for hearing on October 9, 2003, the parties agreeing to bifurcate the issues and to try first the ground for divorce. M.W.F. and D.D.F. were both present and represented by counsel. M.W.F., D.D.F., and their oldest daughter, Jane, were the only witnesses.
¶ 3. D.D.F. testified that the marriage deteriorated in the three years prior to the parties’ separation. At the beginning of that period, Jane informed her mother that when she was approximately six years of age, she had been molested by M.W.F.’s brother, who was approximately thirteen years of age at the time of the molestation. D.D.F. had previously noticed that Jane was never around when her uncle was present and wondered why. D.D.F. informed M.W.F. of Jane’s accusation against his brother and became “furious” when M.W.F. did nothing. M.W.F. continued to invite his brother to the family home, on occasion even for overnight visits. D.D.F. testified that after they learned of Jane’s accusation, M.W.F. allowed his brother to visit in their home approximately once a month. Although D.D.F. asked M.W.F. not to allow his brother back into their home, he refused. D.D.F. testified that she and M.W.F. constantly fought over the matter, with D.D.F. telling M.W.F. that it was unfair to Jane to allow him in their home. At times, the children would hear these arguments, and occasionally Jane “would become a part of it ... because she knew that it was about ... the issues that ... had happened with her.”
¶ 4. D.D.F. testified that every time MW.F.’s brother came to the house, Jane “kept herself locked in her bedroom. Very seldom did she ever come out of her room any time that he was ever in the home.” D.D.F., herself, was “depressed all of the time. It made me feel like ... [M.W.F.] never cared about me or his daughters.” She testified that her blood pressure worsened, and her medication was increased; D.D.F. attributed the increase to the stress of her constant arguing with M.W.F. D.D.F. testified that the couple’s relationship “steadily deteriorated” and “got horribly worse” because she felt that M.W.F. was continuously putting his brother’s needs over his own child and that M.W.F. “turned his back” on her and the children. Towards the end, D.D.F. “could not even bring [herjself to even look at [M.W.F.] with any kind of feelings of the way [she] used to, of loving him for the loving father that he was supposed to be, or the loving husband that he was sup *925 posed to be. That no longer existed for [her]. Not after [she] saw ... what happened over and over again, with him allowing a person that had molested his child into the home.” D.D.F. testified that she did not confront her brother-in-law herself because M.W.F. told her not ever to discuss the matter with “his family, that he would take care of it if he thought that was something that needed to be done. And it was never t[aken] care of.” Finally, just before the separation, D.D. F. informed M.W.F. that she was “just ... not going to allow this to be around my daughter anymore.”
¶ 5. D.D.F. further testified that in this three-year period, M.W.F.’s alcohol consumption became “excessive.” She described that on the days he was off work, M.W.F. would drive to Alabama, buy an eighteen-pack of beer and consume it “probably before the night was over. And this was continuously.” She testified that M.W.F. would “practically pass out ... almost every night from drinking excessively.” The children stopped inviting their friends to the house and stopped having M.W.F. go anywhere with them. D.D.F. recounted once instance just before the separation, when she and the younger daughter were riding in the car with M.W.F. to Mobile; D.D.F. realized that he was too intoxicated to drive. He “couldn’t even remember what road he was on.” He pulled over and allowed D.D.F. to drive only after she threatened to open the door and get out of the car; the younger daughter was “scared ... to death.” D.D.F. testified that she repeatedly asked M.W.F. to stop drinking and finally “asked him to choose between his alcohol and his family;” the response she received was “well, I hope you don’t think that I am going to stop drinking.” D.D.F. filed for divorce shortly thereafter.
¶ 6. D.D.F. testified that she did not feel there was any possibility of reconciliation between herself and M.W.F. “[b]ecause I have no feelings left for [him] whatsoever anymore.” Court-ordered counseling proved unsuccessful, with the counselor terminating the sessions.
¶ 7. 'Jane confirmed much of her mother’s testimony. Jane testified that when she was approximately four or five years old, her uncle molested her. She was not asked to reveal the specifics of the molestation at the hearing but did confirm that her uncle touched her in an improper fashion on more that one occasion. When she spoke with her father about the incidents, he “made [her] feel like he wasn’t going to say [anything to his family about it especially his brother, [and] ... it made me feel like he cared more about what they thought than about my feelings towards him.” She testified that M.W.F. “still let [his brother] come up there whenever he wanted to.” She further testified that she told her father she did not like his brother’s being at the house and left every time he was present. When questioned on cross-examination regarding her uncle’s age at the time of the alleged molestation, Jane confirmed that he was six years older than she and added, “[h]e was old enough to know what he was doing.” Jane reported that he told her “never to talk about it.” When asked if she had any indication that her uncle would try to engage in inappropriate behavior again, Jane responded that she was “not around him enough.” Jane testified that she heard her parents discuss, during the course of their arguments, the fact that it was her father’s “place” to tell his brother that he was not allowed in their home. She stated that when her uncle was at their home, D.D.F. was not “rude” or “hateful” but “just kind of acted like he wasn’t there.”
*926 ¶8. Jane testified that M.W.F. drank “heavily. Like every day that I can recall. I stopped having friends over because it is just like every time I turned around he was embarrassing me because he was drunk.” She testified that his drinking prevented the family from ever going anywhere; D.D.F. “would ask him over and over again ... to kind of calm down on his drinking and he would just ignore her like ... it didn’t matter.” Jane recounted that her mother would ask M.W.F. to think about how much time he was wasting on drinking and not being able to do things with his family. M.W.F. would respond that he was not “drinking that much” or that his drinking did not affect anything. When asked how the drinking affected D.D.F., Jane responded that M.W.F. “was drunk laying [sic] in the recliner and mama, you know, she pretty much was the only one there for me and my sister.” She testified that D.D.F. was “upset” over her father’s drinking, “was pretty depressed about it all the time,” and “would stay kind of distant” from M.W.F. “Quite a few times,” Jane saw her mother “in tears.” On one occasion, Jane “was so upset” that she wrote her father a letter telling him that it hurt her to think that he cared more for drinking than for her, her sister and mother. He never acknowledged receiving her letter.
¶ 9. M.W.F. testified that his wife and daughters “meant everything” to him and that they had “always been first in [his] life.” He did not believe Jane had manufactured her allegations of molestation and admitted that the incidents “upset her”; after he learned of Jane’s allegations, he observed her “feeling down.” He explained that he failed to confront his brother regarding the incidents until after his separation from D.D.F. because when Jane first informed her parents of the molestation, his brother and sister-in-law were grieving over the loss of their one year old child. He testified that it was “hard” for him to tell his brother at that time that he was not allowed in his home; he was waiting until “the right time” to “mention to him” that he “didn’t appreciate what happened.” He further justified his inaction by the fact that his brother and daughter were “just kids when they done that....” M.W.F. contended that his brother only spent the night at the house “a couple” of times after he was aware of Jane’s accusation. He stated that during these visits D.D.F. “treated [his brother] with respect and hospitality” and that Jane “treated him like a regular uncle” and would “hug his neck and tell him good night.” He could not remember Jane’s ever discussing her feelings about her uncle with him prior to his separation from D.D.F. He further denied that he and D.D.F. ever argued over the subject until right before the separation; he admitted, however, that they “talked about it” approximately once a month for three years. He finally acknowledged that “it probably wasn’t” in Jane’s best interest for her uncle to visit.
¶ 10. On direct examination, M.W.F. admitted to “pretty frequent” consumption of alcohol but denied being an alcoholic; he testified that he had quit drinking since his separation from D.D.F. On cross examination, he admitting to having drunk to excess “maybe once a month” in the three-year period prior to the separation. He further admitted to having operated a motor vehicle in close proximity in time to having consumed alcohol on approximately ten occasions in that time period and that D.D.F. and their younger daughter had been in the car on two or three of those occasions. He acknowledged that his daughters had seen him intoxicated “one time or two” and “thinks it probably” bothered his wife and daughters. He denied, however, that he and D.D.F. had argued about his drinking except on one occasion.
*927 ¶ 11. Based on this testimony, the chancellor determined that M.W. F.’s conduct had an adverse impact on his wife’s physical and emotional heath which justified granting D.D.F. a divorce on the ground of cruel and inhuman treatment. The court found “an undisputed pattern of psychological abuse and gross neglect for the feelings and emotional health of [his] wife and children resulting in constant emotional stress which became unbearable for [his] wife and children” sufficient to constitute habitual cruel and inhuman treatment. Specifically, the chancellor determined that the actions of M.W.F. in allowing Jane’s alleged sexual perpetrator repeatedly to come into the family home for overnight visits over the objections of D.D.F. and Jane were “insensitive and caused severe emotional stress which became intolerable.... ” Although D.D.F. had not alleged habitual drunkenness as a ground for divorce, the court found the testimony of all witnesses, including M.W.F., of his drinking to be appropriate for consideration along with the emotional abuse in determining the evidence sufficient to grant the divorce on the ground of habitual cruel and inhuman treatment.
ISSUE
¶ 12. On appeal, M.W.F. raises one issue, whether the chancery court was “manifestly wrong in granting a divorce on the statutory grounds of habitual cruel and inhuman treatment, pursuant to Section 93-5-1(7) of the Mississippi Code of 1972, Annotated.”
STANDARD OF REVIEW
¶ 13. As trier of fact, the chancellor “evaluate[s] the sufficiency of the proof based upon his assessment of the credibility of the witnesses and the weight he thinks properly ascribed to their testimony.” Rakestraw v. Rakestraw, 717 So.2d 1284, 1287(¶ 9) (Miss.Ct.App.1998). Our scope of review is “limited.” Rakestraw, 717 So.2d at 1287(¶ 9). The Mississippi Supreme Court has reiterated that in reviewing a divorce decree: “we view the facts of [the] decree in a light most favorable to the appellee and may not disturb the chancellor’s decision unless we find that decision to be manifestly wrong or unsupported by substantial evidence.” Boutwell v. Boutwell, 829 So.2d 1216, 1220(¶ 13) (Miss.2002).
ANALYSIS
¶ 14. A divorce sought on the ground of habitual cruel and inhuman treatment must be proved by a preponderance of the credible evidence. Chamblee v. Chamblee, 637 So.2d 850, 859 (Miss. 1994). The courts of this State have consistently held:
[t]he conduct which evinces habitual cruel and inhuman treatment must be such that it (1) endangers life, limb, or health, or creates a reasonable apprehension of such danger and renders the relationship unsafe for the party seeking relief, or (2) renders the marriage revolting to the non-offending spouse because it is so unnatural and infamous, and makes it impossible to carry out the duties of the marriage, therefore destroying the basis for its continuance.
Mitchell v. Mitchell, 767 So.2d 1037, 1041(¶ 14) (Miss.Ct.App.2000) (quoting Daigle v. Daigle, 626 So.2d 140, 144 (Miss. 1993)). The conduct must be “something more than unkindness or rudeness or mere incompatibility or want of affection.” Richard v. Richard, 711 So.2d 884, 888(¶ 14) (Miss.1998).
¶ 15. M.W.F. argues that D.D.F. failed to prove conduct on his part endangering her life, limb or health or creating an unreasonable apprehension of danger. He summarizes her grounds as arising “from *928 the fact that ten to twelve years earlier, [his] younger brother, who was between ten or twelve years of age, touched [his] daughter, who was between four and six years of age, in an inappropriate place” and from M.W.F.’s “alleged abuse of alcohol.” As with his conduct over the three-year period leading up to the separation of the parties, M.W.F.’s argument wholly dismisses the serious nature of his daughter’s claim of sexual molestation[2] and the effect his allowing the perpetrator into the family home had on his wife and daughter. The record is undisputed that over the three-year period after Jane informed her parents of the molestation by her uncle, her father never confronted him regarding her accusations and continued to welcome him into the home. The testimony of M.W.F. is, however, diametrically opposed to that of D.D.F. and Jane regarding their response to his brother’s visits; M.W.F. testified that D.D.F. treated his brother with “respect and hospitality;” Jane said she “acted like he wasn’t there.” M.W.F. testified that Jane “treated him like a regular uncle” and would “hug his neck and tell him good night”; D.D.F. testified Jane locked herself in her bedroom and seldom came out. Jane testified that she left the house every time he was present. In accepting the testimony of D.D.F. and Jane, the chancellor was acting within her discretion in resolving questions of witness credibility. See Sproles v. Sproles, 782 So.2d 742, 745(¶ 12) (Miss.2001). The chancellor concluded that the actions of M.W.F. in allowing Jane’s alleged sexual perpetrator repeatedly to come into the family home for overnight visits over the objections of D.D.F. and Jane were “insensitive and caused severe emotional stress which became intolerable....” We agree.
¶ 16. We find that the chancellor applied the correct legal standard and applicable law and rendered a thorough opinion which concluded that M.W.F.’s conduct “caused severe emotional stress which became intolerable and constituted cruel and inhuman treatment.” In Rakestraw, 717 So.2d at 1288, this Court recognized that damage to the complaining spouse’s mental health can constitute harm sufficient to justify an award of divorce based on cruel and inhuman treatment. As in Rakestraw, the chancellor in the instant case determined that the record revealed “an undisputed pattern of psychological abuse and gross neglect” of the complaining spouse resulting in constant emotional stress which became unbearable for her and the children. These findings of emotional distress are supported by substantial evidence in the record, and we will not disturb them on appeal.
¶ 17. M.W.F. erroneously argues that evidence of his alcohol consumption cannot be considered because D.D.F. was seeking a divorce on the ground of habitual cruel and inhuman treatment, not habitual drunkenness. In Boutwell, 829 So.2d 1216, the Mississippi Supreme Court affirmed the chancellor’s award of divorce based on cruel and inhuman treatment where the primary evidence was that the husband had an alcohol and prescription drug problem which resulted in behavior such as road rage, an arrest, taking medication at the home of his in-laws and yell *929 ing at and humiliating his wife in front of her friends and family. In the instant case, the chancellor considered M.W.F.’s alcohol abuse as a secondary rather than the primary basis for the grant of divorce. The testimony of D.D.F. and Jane evidenced M.W.F.’s alcohol abuse and the affect it had on the family. D.D.F. testified that M.W.F. would “practically pass out ... almost every night from drinking excessively.” The children stopped inviting their friends to the house and stopped having M.W.F. go anywhere with them. On one occasion, M.W.F. was so intoxicated while driving with his wife and younger daughter that he did not even know what road he was on. Jane testified that M.W.F. drank “heavily. Like every day that I can recall. I stopped having friends over because it is just like every time I turned around he was embarrassing me because he was drunk.” She testified that his drinking prevented the family from ever going anywhere; D.D.F. “would ask him over and over again ... to kind of calm down on his drinking and he would just ignore her like ... it didn’t matter.” Jane testified that D.D.F. was “upset” over her father’s drinking, “was pretty depressed about it all the time,” and “would stay kind of distant” from M.W.F. She further testified that her mother was “the only one there” for her and her sister as her father was “drunk laying [sic] in the recliner.” M.W.F. contends that while he “drank too much,” D.D.F. was the one who instigated the arguments over his drinking. MW.F.’s contention is ironic, of course, as he swore on oath that only one such argument ever took place. We find that the chancellor appropriately reviewed the conduct of both parties and did not err in considering the effect of M.W.F.’s excessive alcohol consumption as one of the factors warranting divorce on the ground of cruel and inhuman treatment.
¶ 18. Lastly, M.W.F. challenges the lack of medical testimony to support D.D.F.’s claim of increased high blood pressure. M.W.F. quotes Hodge v. Hodge, 837 So.2d 786, 788-89(¶8) (Miss.Ct.App. 2003) in support of his contention: “Mrs. Hodge does not provide any evidence beyond her own testimony that the physical illnesses or mental harm that she suffered were caused by the alleged habitual cruel and inhuman treatment by her husband. The only medical evidence available is inconclusive ....” In Hodge, the wife sought a divorce on the ground of habitual cruel and inhuman treatment based primarily on allegations that her husband forced her to join in his fondness for pornography resulting in great emotional harm to her. Id. at 788(115). The wife’s allegations were completely uncorroborated and, in fact, refuted by credible evidence; the chancellor denied the wife’s request for divorce, and this Court affirmed. Id. at 787-89 (¶¶ 1, 8-9). In the case at hand, while there was no corroborative testimony regarding the increase in D.D.F.’s blood pressure, there was no testimony refuting it, either. As to D.D.F.’s claim of mental harm, Jane corroborated her mother’s testimony in many respects. She testified that D.D.F. was “upset,” “pretty depressed ... all the time,” and “would stay kind of distant” from M.W.F. “Quite a few times,” Jane saw her mother “in tears.” In Rakestmw, we affirmed the grant of divorce based on cruel and inhuman treatment where the wife’s persistent emotional stress was confirmed by friends and family. Rakestraw, 717 So.2d at 1288(¶ 12). In the case at bar, Jane’s confirmation of her mother’s testimony is sufficient to corroborate her mother’s claim of emotional harm.
¶ 19. We find substantial evidence in the record to support the chancellor’s determination that D.D.F. proved the ground of habitual cruel and inhuman treatment *930 by a preponderance of the evidence and, therefore, affirm.
¶ 20. THE JUDGMENT OF THE CHANCERY COURT OF GREENE COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., BRIDGES AND LEE, P.JJ., IRVING, MYERS, CHANDLER, GRIFFIS AND ISHEE, JJ., CONCUR.

. Due to the issues of sexual molestation of a minor child discussed hereinafter, the parties will be designated only by their initials; the child will be referred to as "Jane.”

. As to M.W.F.'s emphasis on the age of his brother at the time of the alleged molestation and his rationalization that this brother and daughter were “just kids” at the time, we would point out that in the event the acts rose to the level of sexual battery under section 97-3-95 of the Mississippi Code (Rev.2000), there is no "just kids” defense. A boy may be guilty of sexual battery of a girl under the age of fourteen if he is 24 or more months older than she. Miss.Code Ann. § 97-3-95(l)(d). In this case, M.W.F.’s brother was six years older than Jane.