[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 335 
¶ 1. This case comes from the Jackson County Chancery Court, Honorable William H. Myers presiding. On January 20, 1998, Cynthia Snoddy filed for divorce on the grounds of habitual cruel and inhuman treatment. The chancery court denied Cynthia's complaint. Cynthia comes now to this Court bringing five issues:
 1. WHETHER THE LOWER COURT COMMITTED REVERSIBLE ERROR BY DISMISSING THE COMPLAINT FOR CONTEMPT FILED AGAINST MARC SNODDY?
 2. DID THE LOWER COURT ERR IN FAILING TO ENTER A FINDING OF FACT AND CONCLUSIONS OF LAW AND IN GRANTING MARC SNODDY AND DOUGLAS CECIL COURTNEY A DIRECTED VERDICT AND DISMISSING THE PLEADINGS OF CYNTHIA SNODDY?
 3. WHETHER THE LOWER COURT COMMITTED REVERSIBLE ERROR IN DISMISSING CYNTHIA'S REQUEST TO HAVE A DEED SET ASIDE WHICH PURPORTED TO CONVEY HER HOMESTEAD TO A THIRD PARTY WITHOUT HER SIGNATURE?
 4. WAS THE CHANCELLOR MANIFESTLY WRONG IN FAILING TO FIND THAT DOUGLAS C. COURTNEY AND MARC SNODDY SHOULD BE EQUITABLY ESTOPPED FROM ASSERTING OWNERSHIP OF THE REAL ESTATE AND MARITAL HOMESTEAD AND WHETHER THE LOWER COURT WAS MANIFESTLY WRONG IN FAILING TO RECOGNIZE A CONSTRUCTIVE TRUST IN FAVOR OF CYNTHIA SNODDY?
 5. DID THE LOWER COURT ERR IN FAILING TO GRANT A DIVORCE TO CYNTHIA SNODDY ON THE GROUNDS OF HABITUAL CRUEL AND INHUMAN TREATMENT?
Finding error, we reverse and remand.
 STATEMENT OF FACTS
¶ 2. Marc and Cynthia Snoddy began living together sometime during the summer of 1979. Two children, both boys, were born to them prior to their marriage. The older son, Jason Paul Snoddy, was born July 24, 1980. The younger son, Bryan Matthew Snoddy, was born January 5, 1982 and died of crib death. Marc and Cynthia were married in June of 1982, and have since had three other children: Lindsey Renee Snoddy, born March 16, 1983; Joel Robert Snoddy, born March 29, 1986; and Michael John Snoddy, born May 16, 1996.
¶ 3. The Snoddys' marriage could best be described as arduous. Marc did not have a regular job from the time they met until 1996 and admitted to selling drugs during this time. Cynthia did not work either. Marc was arrested twice during the course of their marriage: in 1988 in Texas for investment fraud and in 1989 in Mississippi for possession of marijuana with intent to sell (he pled down to a charge of possession). Cynthia admitted she knew of Marc's illegal dealings.
¶ 4. Besides his illegal income, Marc co-owned a hardware store with his brother which they bought in 1979. A large portion of the front of this store was *Page 336 
condemned in 1989 by the State through adverse possession, and Marc was paid the sum of $236,000. Marc's family lived off this money for several years. Eventually, Marc sold the remainder of the store in 1995, and received $120,000, which was also used to support the family.
¶ 5. In 1980, Marc bought the parcel of land upon which the family's home was built. This consisted of twenty acres, and was bought prior to the marriage. Marc later bought an adjoining twenty-four acre parcel after he and Cynthia were married. Construction of the home began in 1982, and was finished in 1984. The upstairs was used by Marc's father as an apartment. In November 1986, Marc conveyed the four acres the house was on to his father, Cecil Courtney. Courtney testified he paid for the construction of the house (approximately $100,000), and he bought the house and land by deed for an additional $40,000 ($140,000 total). This deed was not recorded until 1988, at approximately the same time as Marc's arrest. Cynthia did not co-sign the deed. Later in 1988, Cecil had a deed drawn up conveying the same parcel back to Marc, for the purpose of avoiding problems after his death. This deed was never recorded.
¶ 6. Cynthia filed for divorce in 1990 on the grounds of habitual cruel and inhuman treatment. Cynthia cited as grounds for this divorce Marc's controlling attitudes and an episode in which Marc told her she could no longer use the upstairs portion of the house. According to Cynthia, Marc then began throwing her furniture down the stairs. After some heated words were exchanged, Marc grabbed Cynthia and gave her a spanking. Another point of contention was that Cynthia acquired a credit card and incurred a large amount of debt. The complaint for divorce was withdrawn prior to trial, and Cynthia resumed living with Marc. Marc and Cynthia went to several different counselors to help work things out, and Cynthia went to a psychiatrist several times by herself. She was prescribed medication (anti-depressants) to help deal with stress.
¶ 7. In 1996 Cecil Courtney bought several lots of land upon which he and Marc planned to develop a shopping mall called Washington Plaza. Cecil hired Marc to supervise the building of the project and to manage the mall once it was built. Marc had an extra phone line run to the family home so he could take calls there. Marc paid for some things during the beginning phases of construction such as payment for the movement of dirt and taxes on the land. Marc testified he was reimbursed for these expenditures. Several of Marc's car payments were made by his employer.
¶ 8. Between the time of the first divorce petition being dismissed and the current separation, Cynthia got a job as an office manager. Because Cynthia was at the house less, Marc began doing many things around the house such as cleaning and grocery shopping. Cynthia also got another credit card without Marc's knowledge.
¶ 9. In September of 1997, Marc and Cynthia had their marriage blessed by the Catholic Church. Three months later, in December of 1997, Cynthia separated from Marc after a series of events. On December 13, Cynthia discovered Marc had gone through her purse and found her credit card bill. She confronted him about this, and he told her he wanted her to quit her job. Cynthia claimed Marc then went to her employers' house, threatened them, and told them she was quitting. Marc denied doing this.
¶ 10. Then on December 14, Marc went to Baton Rouge. Before leaving, Marc told Cynthia he expected her to quit her job and have her credit card paid off by the end of the month. Inevitably, an argument ensued. After walking into the *Page 337 
kitchen, where the children were sitting, Cynthia asked Marc to tell them all why he was leaving. In what Marc described as a fit of frustration, Marc told them he sometimes smoked and sold marijuana and at that moment he was going to sell marijuana. Later that month, on Christmas Eve, Marc asked Cynthia if she had done the things he had asked her to do. She told him no. Marc then gave Cynthia a note stating he was fasting and would not bring any more food into the house until she had done the things he had asked her to do. Marc testified he would not have prevented Cynthia from bringing food into the house, only that he would not do any more shopping until she had done those things.
¶ 11. On December 29, Marc was feeding his youngest son, who was two at the time. The boy refused to eat, so Marc refused to let the baby out of his high chair until he ate. Marc told this to Cynthia, and refused to let her pick up the baby. Lindsey, the Snoddy's daughter, then tried to pick up the baby and Marc stopped her. The father and daughter traded several insults, and when Lindsey tried to call the child abuse hotline, Marc grabbed her and threw her out of the house. It was at this point that Cynthia left Marc.
¶ 12. Cynthia filed for divorce on January 20, 1998. She cited the above instances of conduct and Marc's desire to control everything. She was awarded temporary custody of the children and was awarded temporary possession of the marital home. She was also awarded $1500 cash for support, until a hearing could be held in April. Prior to the hearing Cynthia was allowed to amend her pleadings to include her father-in-law, Cecil Courtney, so the court could deal with the sale of the home and the land at Washington Plaza. At the April hearing Marc was ordered to pay $450, due by April 15, 1998, and also to pay child and spousal support in the amount of $1000 a month, $500 to be paid on the first of the month and $500 to be paid on the fifteenth of the month thereafter. This order was amended by the court on May 27, 1998, changing the amount paid per month to $1200 a month ($600 on the first and $600 on the fifteenth) and making Marc responsible for paying all necessary expenses of the children, such as counselors, tutors, and medical professionals. On September 8, 1998, the chancellor entered an order finding Marc in contempt of court for failing to pay the arrearage of his child support, and he was ordered to pay an additional $500 for attorneys fees.
¶ 13. Cynthia filed a second complaint for contempt in December of 1998. Cynthia asked the chancellor to find Marc in contempt of court for failing to pay the arrearage of child support. During this hearing the chancellor decided, for the sake of judicial economy, to hold the matter over until trial to make a final decision on the contempt issue.
¶ 14. It should be noted that during the separation several things occurred which have a bearing on this case. First of all, after the hearing in May, Marc and his daughter Lindsey had another fight. The testimony shows the two were play wrestling in the family home, but soon the playing became heated. Marc was quoted as telling his daughter he would "knock her f____ing head off", and he did not care what the judge said. It was pointed out that during the separation, Marc and Cynthia Snoddy lived together during the time of Hurricane Georges, and they were intimate several times. Though both stated they never had intercourse, they admit coming close to it. Lindsey Snoddy testified she once walked in on the two of them hugging and kissing. Lindsey also testified, citing no date, that Marc had at one *Page 338 
time bugged the phone in the home. Lastly, during the summer before trial, Cynthia Snoddy sent Marc a letter stating a list of things they should resolve if they wanted to save their marriage. This letter was placed into evidence during the trial.
¶ 15. The trial in this matter began March 1, 1999. The trial ran through the second of March, and was then continued until June 1, 1999. During the course of the trial, the chancellor heard testimony from Cynthia Snoddy, Marc Snoddy, Cecil Courtney, Lindsey Snoddy, and three different counselors with whom the Snoddys had met. When asked about Marc's contempt, and whether the arrearage could be caught up by Cynthia getting a loan against the value of some land the couple co-owned in Louisiana, the chancellor stated the parties should see about coming to an agreement, but he was going to make his ruling anyway. At the end of the trial, Courtney and Marc submitted motions to dismiss, and Cynthia moved for a directed verdict. The chancellor stated he would take briefs submitted in the next fifteen days and would enter his ruling. On June 4, 1999, the chancellor entered an order denying Cynthia's petition for divorce and dismissing the action. Cynthia now appeals to this Court.
 DISCUSSION OF LAW STANDARD OF PROOF
¶ 16. This Court has a limited standard of review in reviewing the decisions of a chancellor. McNeil v. Hester, 753 So.2d 1057 (¶ 21) (Miss. 2000). "This Court will not reverse a chancellor's decree of divorce unless it is manifestly wrong as to law or fact. The chancellor, as the trier of fact, evaluates the sufficiency of the proof based on the credibility of witnesses and the weight of their testimony." Fisher v.Fisher, 771 So.2d 364, 367 (Miss. 2000) (citing Richard v. Richard,711 So.2d 884, 888 (Miss. 1998)). A chancellor's findings will not be disturbed upon review by this Court unless the chancellor was manifestly wrong, clearly erroneous, or applied the wrong legal standard. Bank ofMississippi v. Hollingsworth, 609 So.2d 422, 424 (Miss. 1992). "The standard of review employed by this Court for review of a chancellor's decision is abuse of discretion." McNeil, 753 So.2d (¶ 21). The standard of review for questions of law is de novo. Consolidated Pipe Supply Co. v. Colter, 735 So.2d 958, 961 (Miss. 1999).
¶ 17. A chancellor shall make a finding of fact upon request of one of the parties or when required by the rules. M.R.C.P. 52(a). However, when a case is hotly contested and the facts complex, failure to make findings of ultimate fact and conclusions of law is regarded as an abuse of discretion. Forsythe v. Akers, 768 So.2d 943 (¶ 9) (Miss.Ct.App. 2000).
 ANALYSIS 1. WHETHER THE LOWER COURT COMMITTED REVERSIBLE ERROR BY DISMISSING THE COMPLAINT FOR CONTEMPT FILED AGAINST MARC SNODDY?
¶ 18. It should be noted the chancellor in this case found Marc Snoddy in contempt of court for failing to pay his child support on September 8, 1998. At the second pre-trial hearing on the matter of Marc's contempt, the chancellor stated the issue of contempt would be dealt with at trial. During the trial, Cynthia's attorney again raised the issue of contempt. This was done to see if it would be possible to allow Cynthia to get a loan, with the Louisiana property acting as collateral, so she could catch up at least the arrearage Marc owed her in child support. The chancellor replied the parties could try and work it out, but if the parties could not *Page 339 
come to an agreement, then he would make his decision regardless. No further mention is made in the transcript regarding Marc's contempt of court, and no mention is made of Marc's contempt or his child support arrearage in the chancellor's order dismissing the case.
¶ 19. Cynthia raises this issue and argues the chancellor was in error in failing to hold Marc in contempt for failing to pay the child support arrearage. Cynthia argues the children's rights to the child support arrearage were vested, and the chancellor was without power to deprive the children of the arrearage. She states the chancellor has, in effect, set aside judgments that were in favor of the children.
¶ 20. Marc argues the chancellor was dismissing the contempt charge by dismissing the case. Marc points out he and Cynthia were supposed to come to an agreement regarding whether they should get a loan to take care of the arrearage Marc owed, and the parties were to return to the court only if they could not reach an agreement. Marc claims the chancellor "inherently" found there was insufficient evidence to prove Marc was in contempt of court and this was simply a matter within the chancellor's discretion. Marc argues since the chancellor did not award a divorce, then it was unnecessary to move forward on the issue of the child support arrearage or the contempt complaint. Finally, Marc maintains when he and Courtney moved for a dismissal, and Cynthia moved for a directed verdict, Cynthia failed to mention anything regarding Marc's contempt. Marc says this amounts to a failure to preserve the issue, and therefore Cynthia should be barred from raising it. This Court finds Marc's arguments unconvincing.
¶ 21. First of all, a judgment of contempt was entered against Marc Snoddy on September 8, 1998. Whatever the outcome of this appeal, the chancellor's final order changes nothing about the September 8 order of contempt or the attorney's fees Marc owes Cynthia. This Court has recently upheld a chancellor's award of attorney's fees in an action for contempt, and we find no reason in this case not to uphold the award of $500 the chancellor awarded to Cynthia on September 8, 1998. Elliott v. Rogers, 775 So.2d 1285 (¶ 25) (Miss.Ct.App. 2001).
¶ 22. Notwithstanding, the child support was a vested interest which cannot simply be brushed aside by the final order. Child support is awarded for the benefit of the child, and "[t]hese obligations to the child `vest in the child as they accrue, and no court may thereafter modify or forgive them if they be not paid.'" Department of Human Serv.v. Rains, 626 So.2d 136, 138 (Miss. 1993) (quoting Varner v. Varner,588 So.2d 428, 432 (Miss. 1991)). Therefore, the temporary child support payments the chancellor ordered Marc to pay became vested and the chancery court could not simply dismiss them. According to the testimony, Marc failed to pay the full amount of the temporary child support awarded by the chancellor, and Marc should be forced to pay the arrearage of the child support in accordance with the law. Whether there was a divorce awarded or not, Marc Snoddy was still in contempt of court for failing to follow the chancellors order. He does not escape this fact just because the chancellor did not grant a divorce.
¶ 23. Marc argues the parties failed to come to an agreement on how best to deal with Marc's contempt, and even though they did not come to an agreement, the chancellor inherently found Cynthia failed to make a case for contempt. The fact that the parties could not come to an agreement regarding a loan on the land in Louisiana is not found in the *Page 340 
record. As such, it will be ignored because this Court is limited to the facts found in the record and not those injected into the parties' briefs. Colenburg v. State, 735 So.2d 1099 (¶ 6) (Miss.Ct.App. 1999). Next, the argument that the chancellor inherently found that Cynthia failed to prove Marc was in contempt of court, and this was a matter left to the chancellor's discretion fails due to lack of findings. As will be discussed further below, in cases where the facts are complex, it is an abuse of discretion for the chancellor to not make a finding of fact. Forsythe v. Akers, 768 So.2d 943 (¶ 9) (Miss.Ct.App. 2000). This is the case here, and therefore this Court does not endorse the argument that the chancellor inherently found anything in this case.
¶ 24. It is the opinion of this Court that the dismissal of Cynthia's second complaint for contempt should be reversed and remanded to the lower court. There was plenty of testimony offered in this case, most of it coming from Marc Snoddy himself, proving Marc failed to pay the proper amount of child support after being told to do so by the chancellor several times. Generally we grant the decisions of the chancellor a great amount of discretion. Fisher v. Fisher, 771 So.2d 364, 367 (Miss. 2000). However, the proof that Marc was not fulfilling the lower court's order in this matter was so overwhelming that this Court considers it an abuse of discretion to fail to find Marc in contempt. Therefore, we reverse this issue and remand for new proceedings consistent with this Court's decision. We leave it to the lower court to determine the amount of child support arrearage Marc owes.
 2. DID THE LOWER COURT ERR IN FAILING TO ENTER A FINDING OF FACT AND CONCLUSIONS OF LAW AND IN GRANTING MARC SNODDY AND DOUGLAS CECIL COURTNEY A DIRECTED VERDICT AND DISMISSING THE PLEADINGS OF CYNTHIA SNODDY?
¶ 25. The trial court did not provide a finding of fact in its order dismissing this case. As a basis for this issue, Cynthia cites to the conversation at the end of the trial in which the chancellor stated the parties should have briefs before him in fifteen days and then he would make his decision. She also cites to the comment of Rule 50 (a) of the Mississippi Rules of Civil Procedure, which she claims states that a directed verdict should not be granted in a bench trial. M.R.C.P. 50(a). Marc and Cecil Courtney both point out a chancellor can grant an involuntary dismissal through the use of Rule 41(b) of the Mississippi Rules of Civil Procedure. M.R.C.P. 41(b). Marc argues Cynthia failed to ask for a finding of fact and her failure to ask for one should prevent her from citing this as grounds for an appeal. Marc and Courtney also argue the facts in this case were not complex enough to merit an independent finding.
¶ 26. The Mississippi Rules of Civil Procedure state "[i]n all actions tried upon the facts without a jury the court may, and shall upon request of any party to the suit or when required by these rules, find the facts specially and state separately its conclusion of law thereon and judgment shall be entered accordingly." M.R.C.P. 52(a). While the decision to make such findings is considered discretionary, in certain instances where a case is hotly contested and the facts complex, failure to make findings of ultimate fact and conclusions of law will generally be regarded as an abuse of discretion. Forsythe v. Akers, 768 So.2d 943
(¶ 9) (Miss.Ct.App. 2000) (citing Tricon Metals Servs., Inc. v.Topp, 516 So.2d 236, 239 (Miss. 1987)). After a thorough review of *Page 341 
the record, we believe the facts in this case demand a finding of fact. The facts regarding certain instances of conduct during the marriage are in conflict. In addition, the evidence dealing with the conveyance of the homestead greatly complicates this case. As will be discussed in the next issue, the holdings of the chancellor stand in opposition to the established statutory and case law. This in itself is evidence the trial court should have put forth reasons for its holdings. Therefore, we reverse and remand for new proceedings with specific instructions to the chancellor to make appropriate findings of fact on all issues involved in this case.
 3. WHETHER THE LOWER COURT COMMITTED REVERSIBLE ERROR IN DISMISSING CYNTHIA'S REQUEST TO HAVE A DEED SET ASIDE WHICH PURPORTED TO CONVEY HER HOMESTEAD TO A THIRD PARTY WITHOUT HER SIGNATURE?
¶ 27. Cynthia claims the chancellor should have found the conveyance of the homestead property from Marc to Cecil Courtney void, and the failure of the chancellor to do so was an abuse of discretion. Marc Snoddy argues the conveyance was acceptable since the land was part of his separate estate prior to the marriage and because Cynthia had made no contributions to it. He also points out the Snoddys did not claim the land for a homestead exemption on their taxes as proof the land was not the family's homestead. Marc also contends, since the chancellor did not grant a divorce, then it was unnecessary to divide marital property. Cecil Courtney claims there is no way Cynthia did not know of the conveyance, and because she sat on her rights, the statutes of limitations to recover land, found at Miss. Code Ann. § 15-1-7 and § 15-1-9, have already expired. Courtney then goes through a lengthy and unnecessary discussion of the relation back doctrine as a means of justifying his belief that the statute of limitations has run. We find the appellees arguments unconvincing.
¶ 28. "To constitute a homestead there must be actual occupation and use of the premises as a home for the family." Thurman v. Thurman,770 So.2d 1015 (¶ 4) (Miss Ct. App. 2000) (citing Tanner v. Tanner,111 Miss. 460, 462, 71 So. 749, 750 (1916)). A homestead must also not exceed, in quantity and value, the limit prescribed by law. Robbins v.Berry, 213 Miss. 744, 750, 57 So.2d 576, 579 (1952). Miss. Code Ann. § 89-1-29 (Rev. 1999) sets out the requirements for the conveyance of a homestead and states:
 A conveyance, mortgage, deed of trust or other incumbrance upon a homestead exempted from execution shall not be valid or binding unless signed by the spouse of the owner if the owner be married and living with the spouse.
Miss. Code Ann. § 89-1-29 (Rev. 1999). Therefore, the conveyance of a homestead by a husband without the signature of his wife is invalid.Thurman, 770 So.2d at (¶ 4). Travis v. Dantzler, 244 Miss. 360, 362, 141 So.2d 556, 557 (1962); Robbins, 57 So.2d 579.
¶ 29. The lower court erred in dismissing Cynthia's request to set aside the deed which conveyed their homestead to Cecil Courtney. While it is true Cynthia herself did not own the land, or have an ownership interest in the land, she did have a homestead right or interest in the land. The Snoddys were married and both lived on the land prior to its conveyance by deed in 1986. Thus, under Mississippi law, the deed conveying the land to Cecil Courtney should have been signed by Cynthia.Thurman, 770 So.2d at (¶ 4). Since she did not sign it, the deed, and the conveyance *Page 342 
itself, is void. Id. For this reason, the deed should have been set aside.
¶ 30. Courtney argues the statute of limitations for reclaiming land set out in Miss. Code Ann. §§ 15-1-7 and 15-1-9 has run and because of this, any claim Cynthia may have to reclaim the land is time barred. Courtney points out that whether the starting date is 1986, the date of the conveyance, or 1988, the date of the filing, the ten-year period has still passed. This would be true if not for the fact the deed Courtney received was a void deed. As stated above, the deed Courtney received was void because Cynthia did not sign it. In the case of Travisv. Dantzler, the Mississippi Supreme Court held that with a void deed, the ten-year statute of limitations is inapplicable. Travis, 244 Miss. at 362, 141 So.2d at 557. Since the statute of limitations does not apply in this case, whether the date was 1986 or 1988 does not matter. The only way in which the statute of limitations could have run was if Courtney was claiming ownership through adverse possession. If this were the case, Courtney would have to prove all of the elements of adverse possession. He would fail, however, because his occupation was not continuous, nor could it truly be considered hostile.
¶ 31. Courtney also argues Cynthia must have had notice the land had been sold because Marc had surveyors come onto the property and survey the lands around the house. This fact in itself is not proof of knowledge. The appellees were not successful in proving Cynthia had knowledge of the sale, or in getting Cynthia to admit knowing of the sale anywhere in the testimony.
¶ 32. Marc argues this property was not the Snoddys' homestead because they never claimed it as such on their tax returns. This is not very convincing because the testimony proved the Snoddys did not file a tax return until Cynthia began working in 1991, some five years after the supposed sale. Whether they claimed it on their tax return or not, the property was still the homestead. The family lived there from 1984 until the present, and used the land as their residence. It was clearly their homestead.
¶ 33. Marc also points out the land was in his name only, and Cynthia did not have any ownership interest in the land nor had made contributions to its purchase. Marc does so to show the property was not part of the marital estate, and that in case of a property division, Cynthia would not get an interest in the house. Marc seems to forget the house was built and paid for after the marriage began, and contributions of domestic services, like the ones Cynthia contributed while raising the children, are valid material contributions to the marital assets.Ferguson v. Ferguson, 639 So.2d 921, 934 (Miss. 1994). This is something the chancellor should remember when this case is remanded.
¶ 34. This Court holds the conveyance of the homestead was void, and upon remand, the deed conveying the land should be set aside. For this reason, we reverse and render.
 4. WAS THE CHANCELLOR MANIFESTLY WRONG IN FAILING TO FIND THAT DOUGLAS C. COURTNEY AND MARC SNODDY SHOULD BE EQUITABLY ESTOPPED FROM ASSERTING OWNERSHIP OF THE REAL ESTATE AND MARITAL HOMESTEAD AND WHETHER THE LOWER COURT WAS MANIFESTLY WRONG IN FAILING TO RECOGNIZE A CONSTRUCTIVE TRUST IN FAVOR OF CYNTHIA SNODDY?
¶ 35. In this issue, Cynthia claims Marc Snoddy and Cecil Courtney bought land together, using marital funds, and *Page 343 
that Cynthia is entitled to an interest in the land Marc bought with marital funds. For this reason, Cynthia requests this Court impose a constructive trust upon the marital homestead and the Washington Plaza real estate. Marc and Cecil Courtney counter by pointing out the lack of proof Cynthia has provided. In this instance, Marc and Cecil are correct.
¶ 36. "A constructive trust is one that arises by operation of law against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy." In re Abernathy, 778 So.2d 123, 126 (Miss. 2001). To prove such a trust should be imposed by this Court, a confidential relationship must be proven plus an abuse of confidence.McNeil v. Hester, 753 So.2d 1057 (¶ 25) (Miss. 2000) (quotingDavidson v. Davidson, 667 So.2d 616, 620 (Miss. 1995)). This must be proven by clear and convincing evidence. Id.
¶ 37. While there may be a confidential relationship existing, in that Cecil Courtney is Marc's father and thus Cynthia's father-in-law, the evidence linking Marc Snoddy to any ownership interest in the property at Washington Plaza can best be described as minuscule. The greatest link proven connecting Marc to the Washington Plaza land was that he paid for some dirt work on the land and he might have paid some taxes on the land. Marc claims he was reimbursed for all of these. There was some hearsay evidence offered stating Marc said he bought the land, but the direct evidence only proved his father owned the land and that he was only supervising the development of the property. There was some question as to where Courtney got the money to pay for the land, but there was no solid evidence linking any of Courtney's money to anything belonging to Marc Snoddy, and no showing of any sort of wrongful conduct. There was no paper trail. There was not enough evidence offered to prove Marc had any clear and convincing ownership interest in the Washington Plaza land, or that he and his father had conspired to prevent Cynthia from getting any interest in this property. Cynthia failed to prove any kind of wrongdoing, therefore, this Court holds that Cynthia failed to prove a constructive trust should be imposed upon the Washington Plaza land.
¶ 38. Discussion of the homestead and placing a constructive trust on it becomes moot due to the preceding issue. Therefore, we affirm the trial court's holding as to this issue.
 5. DID THE LOWER COURT ERR IN FAILING TO GRANT A DIVORCE TO CYNTHIA SNODDY ON THE GROUNDS OF HABITUAL CRUEL AND INHUMAN TREATMENT?
¶ 39. Cynthia claims she is entitled to a divorce on the grounds of habitual cruel and inhuman treatment. She cites as her basis for this ground her fears surrounding Marc's former employment in the drug trade, mental abuse, Marc's treatment of the children, and Marc's domineering personality. Marc counters claiming Cynthia has failed to meet the standards required by the law in proving habitual cruel and inhuman treatment.
¶ 40. "To support a divorce on the ground of habitual cruel and inhuman treatment, the conduct which evinces habitual cruel and inhuman treatment must be such that it (1) endangers life, limb, or health, or creates a reasonable apprehension *Page 344 
of such danger and renders the relationship unsafe for the party seeking relief, or (2) renders the marriage revolting to the non-offending spouse because it is so unnatural and infamous, and makes it impossible to carry on the duties of marriage, therefore destroying the basis for its continuance." Mitchell v. Mitchell, 767 So.2d 1037, 1041 (Miss.Ct.App. 2000). This must be proven by a preponderance of the evidence and must be more than simple unkindness or lack of affection. Id.
¶ 41. Cynthia claims all of the evidence stated in the facts above, combined with the fact she feels Marc wants to rule over her, is evidence of a continuing course of conduct. Cynthia cites to the fact she had to be medicated because she was suffering from stress due to her marriage. Cynthia also points out the testimony of Jane Ishee, a counselor she had been seeing, who believes Cynthia needs to get a divorce.
¶ 42. Marc believes Cynthia's problems stem from other sources. First, he refers to the death of their second child and the effect it had on Cynthia. Marc specifically points out a conversation Cynthia had with a priest during which Cynthia asked the priest if the boy was in heaven and the priest replied no, because the child had not yet been baptized. Marc also cites to the fact that when she was pregnant with their third son, Cynthia contracted chicken pox and almost died. Marc stated she has never quite gotten all of her strength back. Marc argues the evidence Cynthia offered in this case does not meet the requirements of being cruel, inhuman, systematic, or habitual.
¶ 43. "Although the cruel and inhuman treatment usually must be shown to have been `systematic and continuous,' see Robinson v.Robinson, 554 So.2d 300, 303 (Miss. 1989), a single incident may provide grounds for divorce." Rakestraw v. Rakestraw, 717 So.2d 1284 (¶ 8) (Miss.Ct.App. 1998) (citing Ellzey v. Ellzey, 253 So.2d 249, 250 (Miss. 1971)). The evidence offered in this trial may have been enough to grant a divorce based on habitual cruel and inhuman treatment. However, we are somewhat hamstrung due to the lack of findings of fact. This Court's scope of review is limited, and we may only overturn a chancellor's determination when the findings he makes are manifestly wrong and lack substantial supporting evidence. Rakestraw, 717 So.2d at (¶ 8). As stated in issue two above, we believe that due to the complexity of the facts in this case, the chancellor abused his discretion by failing to make a findings of fact. Therefore, we reverse and remand as to this issue.
 CONCLUSION
¶ 44. This Court finds the lower court abused its discretion in failing to put forth a finding of fact, and for this reason we reverse and remand on issues one, two, and five of this opinion. A verdict on issue three was rendered by this Court, and issue four was affirmed and should not be heard on rehearing. In addition, this Court holds that in whatever decision the lower court makes, it should accompany its decision with a finding of fact.
¶ 45. THE JUDGMENT OF THE CHANCERY COURT OF JACKSON COUNTY ISHEREBY REVERSED AND REMANDED. COSTS OF THIS APPEAL ARE ASSESSED TOTHE APPELLEES.
McMILLIN, C.J., KING AND SOUTHWICK, P. JJ., PAYNE, THOMAS, LEE,IRVING, AND CHANDLER, JJ., CONCUR. MYERS, J., NOT PARTICIPATING. *Page 804