CARLSON, Presiding Justice,
for the Court:
¶ 1. Dwight Robinson filed suit against Bailey Lumber & Supply Company for injuries and damages he allegedly sustained as a result of a fall on Bailey Lumber’s premises. A trial was held in Hinds County Circuit Court, First Judicial District, and a jury returned a general verdict in favor of Robinson in the amount of $1,500,000. The trial court reduced the award to $1,070,341.42 in economic and noneconomic damages. Aggrieved, Bailey Lumber filed this appeal. We reverse and remand, finding that the trial court erred in allowing Dr. Obie McNair to offer expert testimony regarding the cause of *989 Robinson’s need for hip-replacement surgery and future medical treatment.

FACTS

¶ 2. In September 2006, Bailey Lumber operated a building-and-lumber-supply retail store in Jackson, Mississippi. According to Robinson, he went to Bailey Lumber on September 6, 2006, because he had purchased paint there a few days before and had not been given the correct color. Robinson testified that Drew Holland, a Bailey Lumber employee, asked Robinson to follow him to a computer room to determine what had gone wrong with mixing the paint. Robinson testified that this area was an employee-only area, but Holland testified that all customers who bought paint were taken to the computer room.
¶ 3. Holland escorted Robinson from the paint-mixing room into the computer room. Robinson testified that the paint-mixing room was dimly lit, that the computer room was completely dark, and that the only thing he could see was the light from the computer screen. Holland disputed that testimony, testifying that it was not dark in the computer room on the day of the accident and that the lights were always on in those rooms. As Robinson was following Holland out of the computer room and returning to the paint-mixing room, he tripped over a two-inch step in the threshold of the doorway between the two rooms. Robinson had stepped up the step going into the computer room, but he tripped when stepping down on his way out of the computer room. Robinson claimed that he could not see the step because it was dark in the computer room.
¶ 4. According to Robinson, he fell on his hip and struck his head on a stack of paint cans. He said that he immediately experienced pain in his left hip. He testified that no warning signs were posted and that Holland had failed to warn him of the floor’s condition. He further testified that, afterward, Holland expressed awareness of the hazardous condition and admitted to Robinson that Bailey Lumber “should have fixed that floor a long time ago.” At trial, Holland testified that he did not make any such statement to Robinson. Larry Wait-man, the Bailey Lumber store manager, rushed to assist Robinson after the fall. Waltman testified that, upon his arrival, the area in which Robinson had fallen was well lit, and that the two-inch step was very obvious. Robinson denied needing medical treatment after the fall. He walked to his vehicle and drove himself home.
¶ 5. Fifteen days after the fall, Robinson sought medical treatment from Dr. Obie McNair, an internal medicine and pulmonary medicine specialist. Robinson complained of hip pain, had an abrasion on his arm, and indicated to Dr. McNair that he had experienced a fall. Dr. McNair noted a limited range of motion, particularly in Robinson’s left hip. An x-ray revealed that Robinson had osteoarthritis in his left hip, resulting in a loss of joint space. Dr. McNair suggested to Robinson that he might need surgery on his hip, and recommended that he see Dr. Walter Shelton, an orthopedic surgeon at the Mississippi Sports Medicine and Orthopaedic Center, who had performed surgery on Robinson’s torn quadriceps after an on-the-job fall earlier that year. Dr. Shelton discussed the need for surgery on Robinson’s left hip and referred him to Dr. Lane Laken, an orthopedic surgeon at the G.V. (Sonny) Montgomery VA Medical Center. Sixteen months after the fall at Bailey Lumber, Dr. Laken performed hip-replacement surgery on Robinson’s left hip.

PROCEDURAL HISTORY

¶6. Robinson filed suit against Bailey Lumber on February 5, 2009, for injuries *990 and damages he allegedly sustained as a result of the fall on Bailey Lumber’s premises. Robinson alleged that Bailey Lumber had failed to maintain reasonably safe premises and had failed to warn him of an alleged unreasonably dangerous condition. He claimed injuries to his back, hip, and forearm, and sought compensatory damages for medical expenses, pain and suffering, emotional and mental anguish, loss of enjoyment of life, physical injuries, and past, present, and future wage loss. Initially, he sought punitive damages as well, but the punitive-damages claim was dropped prior to trial.
¶ 7. The case went to trial on August 30, 2010. The jury heard testimony from Robinson, his three treating physicians, and the two Bailey Lumber employees. At trial, Dr. McNair testified that, prior to the fall at Bailey Lumber, Robinson had osteoarthritis in his left hip and a history of sciatica. Dr. McNair conceded that Robinson had a history of three prior falls before his accident at Bailey Lumber in 2006,[1] as well as two falls in 2008 and a motor vehicle accident in 2009. Dr. McNair was allowed to testify at trial that, although Robinson had osteoarthritis in his left hip prior to the fall at Bailey Lumber, the fall had aggravated his condition to such a degree that hip-replacement surgery was necessary. Dr. McNair testified that, in his thirty-year career, he had treated hundreds of patients with hip problems related to fractures, osteoarthritis, and hip-replacement surgery, but acknowledged that he was not a specialist in orthopedic surgery. Dr. McNair testified that he thought Robinson might need surgery on his hip, so he referred Robinson to Dr. Shelton, an orthopedic surgeon who previously had treated Robinson.
¶ 8. Dr. Shelton saw Robinson in October 2006 when Robinson presented with hip pain and brought in x-rays showing degenerative arthritis in his left hip. Dr. Shelton’s videotaped deposition was played for the jury at trial. Dr. Shelton testified that any pain or discomfort as a result of the September 2006 fall at Bailey Lumber would have lasted approximately two weeks to one month, and he attributed Robinson’s need for a hip replacement to pre-existing arthritis. Dr. Shelton referred Robinson to Dr. Laken, an orthopedic surgeon at the YA hospital, for the surgery. Dr. Laken performed the hip-replacement surgery in January 2008, sixteen months after Robinson’s fall at Bailey Lumber. Dr. Laken’s videotaped deposition was played for the jury at trial. His testimony was that the fall would have aggravated Robinson’s pre-existing condition, but that any complications as a result of the fall would have subsided within three or four months. Dr. Laken testified that any aggravation of Robinson’s preexisting condition that could have been caused by the fall at Bailey Lumber would not have caused Robinson to need hip-replacement surgery.
¶ 9. Ultimately, the jury found in favor of Robinson and awarded $1,500,000. In the final judgment, the trial judge found that Robinson was entitled to only $70,341.42 in economic damages, because that was the amount of medical expenses adduced at trial. The trial judge interpreted the remainder of the damages awarded to be noneconomic damages, which were reduced to $1,000,000, pursuant to Mississippi Code Section 11-1-60. See Miss.Code Ann. § 11 — 1—60(2)(b), (c) (Supp.2011). Thus, the jury’s general verdict was reduced to $1,070,341.42 for both economic and noneconomic damages.
*991 ¶ 10. Both parties filed post-trial motions. Robinson filed a Motion for Judgment Notwithstanding the Verdict or in the Alternative for an Additur, alleging the trial court had erred in reducing the jury’s verdict. Bailey Lumber filed a Motion for Judgment Notwithstanding the Verdict or, in the Alternative, New Trial, or Remitti-tur, and raised multiple alleged errors it contended had been committed by the trial court. The trial court denied the motions, and Bailey Lumber filed this appeal. Robinson has not appealed the final judgment of the trial court or the apportionment or reduction of damages by the trial judge.

DISCUSSION

¶ 11. Bailey Lumber appeals the denial of its motions for judgment notwithstanding the verdict, for a new trial, and/or remittitur. This Court reviews de novo a denial of a motion for judgment notwithstanding the verdict. Poole ex rel. Wrongful Death Beneficiaries of Poole v. Avara, 908 So.2d 716, 726 (Miss.2005). When considering a trial court’s denial of a motion for a new trial, this Court’s standard of review is abuse of discretion. Id. The standard of review for the denial of a remittitur is also abuse of discretion, and a jury’s award of damages will not be disturbed unless the amount of the award compared to the amount of actual damages “shocks the conscience.” Entergy Mississippi, Inc. v. Bolden, 854 So.2d 1051, 1058 (Miss.2003).
I. Whether Dr. Obie McNair was qualified to offer expert opinion testimony regarding the cause of Robinson’s need for hip-replacement surgery.[2]
¶ 12. At trial, Dr. McNair opined that Robinson had osteoarthritis in his hip before his fall at Bailey Lumber, but the fall had injured the already-damaged hip and the condition had been aggravated to such a degree that hip-replacement surgery was necessary. Bailey Lumber argues that Dr. McNair was not qualified to give a causation opinion as to the need for a hip replacement because it was outside his discipline, given that Dr. McNair is an internal medicine physician with a subspe-ciality in pulmonology. Further, Bailey Lumber argues that Dr. McNair’s testimony was not reliable in that it did not meet the evidentiary requisites pronounced in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and adopted by this Court in Mississippi Transportation Commission v. McLemore, 863 So.2d 31 (Miss. 2003). For these reasons, Bailey Lumber contends that the trial court erred in qualifying Dr. McNair as an expert and allowing his testimony regarding the cause of Robinson’s hip-replacement surgery.
¶ 13. “Our well-established standard of review for the trial court’s admission or suppression of evidence, including expert testimony, is abuse of discretion.” Tunica County v. Matthews, 926 So.2d 209, 212 (Miss.2006) (citing McLemore, 863 So.2d at 34). Expert testimony should be admitted only if it satisfies Rule 702 of the Mississippi Rules of Evidence, which provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based upon sufficient facts or data, (2) the *992 testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
Rule 702 sets forth two prongs for determining whether expert testimony should be admitted. “First, the witness must be qualified by virtue of his or her knowledge, skill, experience^] or education_ Second, the witness’s scientific, technical[,] or other specialized knowledge must assist the trier of fact in understanding or deciding a fact in issue.” McLemore, 863 So.2d at 35 (internal citations omitted). In other words, the expert witness must be qualified to render the opinion, and the testimony must be relevant and reliable. Watts v. Radiator Specialty Co., 990 So.2d 143, 146 (Miss.2008) (citing McLemore, 863 So.2d at 35). See also Rebelwood Apartments RP, LP v. English, 48 So.3d 483, 494 (Miss. 2010) (“expert’s qualification and reliability of testimony are separate questions”).
¶ 14. We find that the trial court properly accepted Dr. McNair as a medical expert in internal medicine and primary care. Under that designation, Dr. McNair certainly was qualified to opine regarding diagnosing a hip problem, referring a patient to an orthopedic surgeon, or making other evaluations from the standpoint of a primary-care or internal-medicine physician. However, his testimony should have been limited to those areas. With regard to Dr. McNair’s testimony as to the cause of Robinson’s need for a hip replacement, we find that Dr. McNair, an internal-medicine physician with a subspeciality in pul-monology, does not satisfy the qualification and reliability standards of Rule 702.
A. Dr. McNair was not qualified, under the Rule 702 standard, to testify regarding causation or the necessity of the hip-replacement surgery.
¶ 15. We have held that a physician does not have to practice in, or be a specialist in, every area in which he offers an opinion, but he must demonstrate that he is “sufficiently familiar with the standards” in that area by his “knowledge, skill, experience, training, or education” to satisfy Rule 702. Troupe v. McAuley, 955 So.2d 848, 856 (Miss.2007). “[W]hile this Court has said a specialist in a particular branch within a profession will not be required, we have gone on to say, only if the witness possesses scientific, technical, or specialized knowledge on a particular topic will he qualify as an expert on that topic.” Worthy v. McNair, 37 So.3d 609, 616 (Miss.2010) (internal citations omitted) (emphasis in original). An expert witness “must exercise the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.” Troupe, 955 So.2d at 858 (quoting Poole, 908 So.2d at 724).
¶ 16. In Troupe v. McAuley, this Court held that the trial judge did not abuse his discretion by excluding the testimony of a neurosurgeon who attempted to testify about the standard of care for a neuro-otolaryngologist. Troupe, 955 So.2d at 858. Neurosurgery involves surgery upon the head, scalp, skull, brain, and arteries leading to the brain, while neuro-otolaryn-gology requires additional training in ear, nose, and throat surgery. Id. at 849 n. 2, 852. This Court agreed with the trial judge that the neurosurgeon was not sufficiently familiar with the standards of neu-ro-otolaryngology by knowledge, skill, experience, training, or education, and he was not qualified to give expert opinion testimony about that specialty. Id. at 856, 858. See also McDonald v. Mem’l Hosp. at Gulfport, 8 So.3d 175, 181 (Miss.2009) (expert in a medical-malpractice action does not have to “be of the same specialty” as the defendant, but “must show satisfactory familiarity with the specialty of the *993 defendant doctor in order to testify as to the standard of care owed to the patient”).
¶ 17. Similarly, in Cheeks v. Bio-Medical Applications, Inc., this Court held that for a family physician to testify in a medical-malpractice action against a dialysis clinic, the physician “must have been familiar with the standard of care to which a dialysis clinic, a nephrologist!,] and a radiologist are held.” Cheeks v. Bio-Med. Applications, Inc., 908 So.2d 117,120 (Miss.2005). The family physician “had no special training or experience in the field of nephrology” and “had never participated in a dialysis procedure.” Id. He testified that he “relied on the expertise of a nephrologist” regarding dialysis treatments needed for his patients. Id. This Court held that the family physician did not satisfy Rule 702, because he “did not have the specialized knowledge to assist the trier of fact [in] understanding] the evidence concerning the dialysis procedure!,]” and he was not qualified to offer expert opinions regarding the standard of care of the dialysis clinic and the doctors therein. Id. at 121.[3]
¶ 18. Dr. McNair is an internal-medicine physician with a subspeciality in pulmonary medicine. We find that the trial judge correctly accepted Dr. McNair as an expert in internal medicine and as a primary-care physician. Dr. McNair did his residency in internal medicine, followed by a pulmonary fellowship from 1988 to 1990. Dr. McNair then practiced in the field of pulmonary medicine from 1991 to 2001. Dr. McNair explained that pulmonary medicine is a subspeciality of internal medicine, pertaining to diseases of the lungs and respiratory system. In 2002, Dr. McNair moved from pulmonary medicine to internal medicine, and had been practicing internal medicine for approximately five years at the time of this incident. Dr. McNair described internal medicine as “the opposite of pediatrics,” meaning that he treats adult patients. He testified that he is not a surgeon, rather he generally deals with “problems that can be treated with medicine.” Dr. McNair has performed research and had several publications in his areas of expertise, including publications on- the topics of E-coli bacteria, the urinary bladder, and chest x-rays. Dr. McNair is board-certified in internal medicine and pulmonary medicine.
¶ 19. At trial, Dr. McNair testified that Robinson had osteoarthritis before the fall at Bailey Lumber, but that the fall had exacerbated his condition to such a degree that a hip replacement was necessary. Dr. McNair testified that he had suggested to Robinson that hip surgery was needed, and he had recommended that Robinson see Dr. Shelton, an orthopedic surgeon. *994 Dr. McNair testified that an orthopedic surgeon was needed because Dr. McNair was not qualified to perform the hip surgery or even to render a final opinion regarding Robinson’s need for the surgery. After referring Robinson to Dr. Shelton, Dr. McNair did not follow up with the orthopedic surgeon or have any further consultation with him whatsoever.
¶ 20. Dr. McNair testified that in his thirty-year career, he had treated hundreds of patients with hip-related problems related to fractures, osteoarthritis, and hip-replacement surgery, but conceded that he was not a specialist in orthopedic surgery. Orthopedic surgery is surgery on the bones, joints, and musculoskeletal system. Dr. McNair does not have specialized training in orthopedics, he did not do a residency or a fellowship in orthopedic surgery, he is not board-certified in orthopedic surgery, and he has not done any research or published any articles related to orthopedic surgery or hip replacements. Dr. McNair is not a surgeon of any type, and he candidly admitted that when he has a patient who he believes needs a hip replacement, he refers the patient to an orthopedic surgeon. Dr. McNair testified that he would not determine when or how to perform a hip replacement; the orthopedic surgeon would make those decisions.
¶ 21. We do not dispute that Dr. McNair is qualified to give expert testimony pertaining to internal medicine, pulmo-nology, or any area in which he has the “knowledge, skill, experience, training, or education” sufficient to support his opinions. The trial court accepted Dr. McNair as a medical expert in internal medicine and primary care, and his testimony should have been limited to those areas. Dr. McNair certainly was qualified to opine regarding diagnosing a hip problem, referring a patient to an orthopedic surgeon, or other evaluations made from the standpoint of a primary-care or internal-medicine physician. Beyond that, Dr. McNair was not qualified to offer expert testimony regarding whether the fall at Bailey Lumber was the cause of Robinson’s need for a hip replacement. The trial court erred in allowing Dr. McNair to offer expert testimony outside the areas in which he was qualified.
B. Assuming, arguendo, that Dr. McNair was qualified to testify regarding causation, his testimony in this case would not have met the reliability prong of Rule 702.
¶ 22. Because we have determined that Dr. McNair was not qualified to testify regarding the cause of Robinson’s need for a hip replacement, we could stop the analysis here without addressing the second prong of Rule 702-reliability. However, because Dr. McNair’s testimony raises significant questions with regard to reliability, we will address it briefly.
¶ 23. A party offering expert testimony “must show that the expert has based his testimony on the methods and procedures of science, not merely his subjective beliefs or unsupported speculation.” McLemore, 863 So.2d at 36 (citing Daubert, 509 U.S. at 590, 113 S.Ct. 2786). Adopting the Daubert standard for determining reliability, this Court held:
The Court in Daubert adopted a non-exhaustive, illustrative list of reliability factors for determining the admissibility of expert witness testimony. Id. at 592-94, 113 S.Ct. 2786. The focus of this analysis “must be solely on principles and methodology, not on the conclusions they generate.” Id. at 595, 113 S.Ct. 2786. These factors include whether the theory or technique can be and has been tested; whether it has been subjected to peer review and publication; whether, in respect to a particular technique, there *995 is a high known or potential rate of error; whether there are standards controlling the technique’s operation; and whether the theory or technique enjoys general acceptance within a relevant scientific community. Id. at 592-94, 113 S.Ct. 2786.
McLemore, 863 So.2d at 36-37. We find no evidence in the record that Dr. McNair consulted any literature, applied a particular theory, performed any procedures, or relied on any principles, methodologies, or scientific methods in concluding that the need for the hip replacement was a result of Robinson’s fall at Bailey Lumber.
¶ 24. Again, we emphasize that a physician does not have to be a specialist in every area in which he offers an opinion, but he must demonstrate that he is “sufficiently familiar with the standards” in that area. Troupe, 955 So.2d at 856. And “only if the witness possesses scientific, technical, or specialized knowledge on a particular topic will he qualify as an expert on that topic.” Worthy, 37 So.3d at 616 (internal citations omitted) (emphasis in original). In Worthy v. McNair, we were faced with a similar situation in which a physician attempted to offer expert testimony in an area outside of his primary discipline, and the conclusions he offered were unreliable.
... We agree with the trial judge that Dr. Halbridge qualifies under the Daubert/Kumho [v. Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) ] standard to testify as to the standard of care. We further find that the trial court did not abuse its discretion in finding that Dr. Halbridge’s testimony was unreliable as to the cause of the baby’s death. Such testimony would be outside his discipline or the particular topic in which he possessed scientific, technical, or specialized knowledge. Not only was Dr. Halbridge testifying outside his particular discipline, but the report on which he rested his opinion reached an inconclusive result. The Worthys complain on appeal that “no evidence [was presented to the trial court] that Dr. Halbridge’s opinions were not properly grounded] in scientific knowledge,” and therefore, the trial court was in error for finding his testimony unreliable. However, Dr. Carole Yogler, a pediatric pathologist who also testified as an expert witness for the Worthys, directly contradicted the testimony of Dr. Halbridge as to the cause of the baby’s death- Therefore, although Dr. Vogler’s testimony was submitted by the plaintiffs rather than the defendants, sufficient evidence which contradicted the testimony of Dr. Hal-bridge was properly before the trial court when the court ruled on the defendant’s Daubert motion.
Based on the foregoing analysis, the trial court did not abuse its discretion in finding Dr. Halbridge’s testimony unreliable, and therefore inadmissible, under the Daubert standard.
Worthy, 37 So.3d at 616-17 (emphasis in original). Like the doctor in Worthy, Dr. McNair’s testimony as to causation was unreliable, and it should not have been allowed.
¶ 25. Dr. McNair repeatedly testified that, of the hundreds of patients he had treated with hip-related problems, approximately seventy percent of hip-replacement surgeries were needed due to osteoarthritis. If seventy percent of hip-replacement surgeries are needed as a result of osteoarthritis, Dr. McNair should have been able to provide some evidence as to what factors put Robinson with the thirty percent of patients whose surgery was the result of some other cause. Dr. McNair testified about reading x-rays, and we would not question his ability to do so. He *996 testified that the only thing present on Robinson’s x-ray was osteoarthritis, specifically a loss of joint space in his hip, referred to as sclerosis. Dr. McNair did not identity a fracture, bruising, break, or any other anomaly that may have exacerbated Robinson’s pre-existing osteoarthritis. Dr. McNair could not point to one thing that could have resulted in Robinson needing a hip replacement that would have removed Robinson from the seventy-percent probability that the hip replacement was needed due to osteoarthritis, which he clearly had prior to the fall. In fact, after reviewing Robinson’s prior medical records, Dr. McNair conceded that, as far back as 2002, x-rays showed that Robinson had “moderate degenerative arthritis.” Dr. McNair testified that degenerative arthritis, or osteoarthritis, was due to “wear and tear” or “aging.”
¶ 26. The two orthopedic surgeons who treated Robinson, Dr. Shelton and Dr. Laken, both testified that Robinson’s need for hip-replacement surgery was due to pre-existing osteoarthritis, and that his osteoarthritis was not aggravated by the fall at Bailey Lumber. Specifically, Dr. Laken, the orthopedic surgeon who performed the hip-replacement surgery, testified that Robinson’s need for hip-replacement surgery was due to “wear and tear” and “degenerative joint disease.” He testified that any aggravation of Robinson’s preexisting condition that could have resulted from the fall at Bailey Lumber would not have caused Robinson to need hip-replacement surgery. Dr. McNair, the only doctor to testify who was not an orthopedic surgeon, was the only one who believed the need for the hip replacement was the result of the fall at Bailey Lumber, although he provided no basis for that conclusion. In fact, Dr. McNair testified that he would defer to Dr. Laken regarding orthopedic treatment, orthopedic surgery, and the reason he performed the surgery.
¶ 27. In addition to Dr. McNair failing to provide any basis for his conclusion that the hip replacement was necessitated by the fall at Bailey Lumber, Dr. McNair admitted at trial that he had changed his opinion after being asked to do so by Robinson’s attorney. In July 2008, Dr. McNair completed a questionnaire and indicated that the cause of Robinson’s hip injury was unknown. In November 2008, at the behest of Robinson’s counsel, he completed a second questionnaire and indicated that the fall at Bailey Lumber had aggravated Robinson’s pre-existing condition. Dr. McNair testified that he did not treat Robinson or review any additional records between the first and second questionnaire. He did, however, receive a phone call from Robinson’s attorney, who told him that Robinson had a prior history of hip problems. Dr. McNair testified that the attorney asked him to fill out a second questionnaire, and Dr. McNair agreed to do so.
¶28. Even if Dr. McNair had been qualified to testify as to causation, which he was not, his testimony was not reliable. He did not apply any known and tested theories, consult any literature, or rely on any principles, methodologies, or scientific methods in reaching his conclusion, nor did he have personal experience as an orthopedic surgeon. Dr. McNair did not provide a basis for his conclusion, which was directly contradicted by the expert opinions of the two orthopedic surgeons. The trial court erred in finding that Dr. McNair was qualified to testify as to causation and in allowing him to provide an unreliable opinion.

II. Whether the trial judge erred in allowing Dr. McNair to testifg regarding future medical expenses when the substance of his opinion on that topic was not provided to Bailey Lumber prior to trial.

¶ 29. Not only did the trial judge fail to exercise his gatekeeping responsibil *997 ity under the facts of this case, he compounded the problem by allowing Dr. McNair to testify regarding future medical treatment and expenses when the substance of his opinion in that regard was not provided to defense counsel prior to trial. Regarding future medical expenses, Robinson’s expert designation of Dr. McNair provided:
Dr. McNair is anticipated and/or expected to testify to ... future medical treatment dates and past, current[,] and future pain and suffering ... current and future medications; ... past and future pain and suffering; past, present[,] and future costs, including the likelihood that Plaintiff will require future surgeries and the estimated costs of surgery ... any and all future medical needs, treatments, and costs [that] are related to the injuries Plaintiff suffered as a result of the subject incident of September 6, 2006.
At trial, Robinson’s counsel asked Dr. McNair about future treatment and medication that Robinson may need. Bailey Lumber objected to this line of testimony because Dr. McNair’s opinions on these topics were not provided to defense counsel prior to trial. The trial court allowed the testimony, finding that Bailey Lumber had notice that Dr. McNair would testify in those areas. We find that the trial judge erred in finding that Bailey Lumber had sufficient notice of Dr. McNair’s proposed testimony based on the designation set forth above.
¶ 30. Rule 26 of the Mississippi Rules of Civil Procedure provides that, upon request from the opposing party, a party must provide the name of each expert witness it plans to call at trial along with “the subject matter on which the expert is expected to testify, ... the substance of the facts and opinions to which the expert is expected to testify[,] and a summary of the grounds for each opinion.” Miss. R. Civ. P. 26(b)(4)(A)(i). This Court has emphasized that it is imperative for parties to disclose more than just the general subject matter on which an expert will testify.
[A]ll courts in administering and applying discovery rules must afford the attorney ample time before trial to receive the names of all experts who will be called at trial and meaningful information about their proposed testimony. Rule 26(b)(4) requires disclosure of “facts known and opinions held by experts,” and as to each proposed testifying expert, to state “the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.” This means that the substance of every fact and every opinion which supports or defends the party’s claim or defense must be disclosed and set forth in meaningful information which will enable the opposing side to meet it at trial.
Not only this, the “grounds” or basis of each opinion must be disclosed. If the expert’s opinion is based upon his own experience, the answer should so state, and if based upon some other ground, the precise source should be likewise disclosed.
If truth is to be attained in the trial process, it is imperative that the attorneys and experts testifying will be fully knowledgeable as to the other party’s contentions and claims well in advance of trial.
Nichols v. Tubb, 609 So.2d 377, 384 (Miss. 1992). See also T.K. Stanley, Inc. v. Cason, 614 So.2d 942, 950-51 (Miss.1992) (answer to expert interrogatory limited the subject of doctor’s testimony to causation; his testimony as to permanent disability should have been excluded because that was a separate subject from causation); Jones v. Hatchett, 504 So.2d 198, 202 *998 (Miss.1987) (expert testimony should not have been allowed where name of expert, but no information pertaining to the expert’s testimony, was provided to opposing counsel four days before trial); Square D Co. v. Edwards, 419 So.2d 1327, 1329 (Miss.1982) (expert testified as to three specific design defects, which had not been identified prior to trial; judgment was reversed and remanded because plaintiff had not supplemented discovery to indicate the substance of his expert’s testimony).
¶ 31. The trial court erred in allowing Dr. McNair to testify about future medical treatment and expenses because defense counsel was not provided with “the substance of [his] facts and opinions” on that subject prior to trial. Robinson’s general designation of Dr. McNair did not satisfy Rule 26. Because it is unclear from the jury verdict form whether future medical treatment and expenses were considered by the jury and included in the award, it is possible that allowing this testimony was harmless error. However, it was an error nonetheless and could have bolstered Dr. McNair’s credibility before the jury, compounding the problem of allowing his unqualified and unreliable testimony as to causation.

CONCLUSION

¶ 32. We find that Dr. McNair was properly tendered as an expert in internal medicine and primary care, and he certainly was qualified to testify as to those areas. However, the trial court abused its discretion in finding Dr. McNair qualified to render expert opinion on the cause of Robinson’s need for hip-replacement surgery, which was outside his area of expertise. The trial court also erred in allowing Dr. McNair to testify regarding future medical treatments, medications, and expenses, when Bailey Lumber was not provided with the substance of his opinion prior to trial. Therefore, we reverse the judgment rendered in favor of Dwight Robinson, and we remand this case to the Circuit Court for the First Judicial District of Hinds County for a new trial and proceedings consistent with this opinion.
¶ 33. REVERSED AND REMANDED.
DICKINSON, P.J., RANDOLPH, LAMAR AND PIERCE, JJ., CONCUR. KITCHENS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY CHANDLER AND KING, JJ. WALLER, C.J., NOT PARTICIPATING.

. The most serious of Robinson’s previous falls had occurred during Robinson's employment as a firefighter with the City of Jackson. Robinson experienced a fall on the job in April 2006 that resulted in a tear to his right quadriceps tendon, which required surgery.

. Bailey Lumber presented five issues on appeal, but we will address only the two disposi-tive issues.

. To prevail in a negligence action, such as a premises-liability case, the plaintiff must prove each element of negligence: duty, breach of that duty, proximate causation, and damages or injury. Thomas v. Columbia Group, LLC, 969 So.2d 849, 852 (Miss.2007) (citing Lyle v. Mladinich, 584 So.2d 397, 398 (Miss. 1991)). "Notably, in a premises liability case, merely proving that an accident occurred is not sufficient to establish liability.” Day v. Ocean Springs Hosp. Sys., 923 So.2d 246, 250 (Miss.Ct.App.2006) (internal citations omitted). In this case, the parties offered medical-expert testimony to prove causation. Those physicians are held to the same standard as any testifying expert. Many cases in which physicians testify are medical-malpractice actions, such as the cases we have relied on here. The fact that these are medical-malpractice cases does not make the comparison unreliable, as the dissent suggests. (Dis. Op. ¶ 35) Experts, medical or otherwise, are held to the same standards in all cases. The doctors in Troupe v. McAuley and Cheelcs v. Bio-Medical Applications, Inc. were not qualified to testify as to the standard of care in areas that were outside their areas of expertise. Similarly, Dr. McNair is not qualified to testify as to causation in an area that is outside his area of expertise.