# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-CA-00452-COA

**CLAY JEFFREY MOSS**                                                          **APPELLANT**

**v.**

**VICKY ROGERS MOSS**                                                         **APPELLEE**

DATE OF JUDGMENT:                12/14/2020
TRIAL JUDGE:                     HON. HAYDN JUDD ROBERTS
COURT FROM WHICH APPEALED:       RANKIN COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:          ANDREW STEPHEN SORRENTINO
ATTORNEYS FOR APPELLEE:          MATTHEW THOMPSON
                                 CHAD KENNETH KING
NATURE OF THE CASE:              CIVIL - DOMESTIC RELATIONS
DISPOSITION:                     AFFIRMED - 09/20/2022
MOTION FOR REHEARING FILED:      10/18/2022 - DENIED; AFFIRMED -
                                 03/14/2023

**EN BANC.**

**BARNES, C.J., FOR THE COURT:**

## MODIFIED OPINION ON MOTION FOR REHEARING

¶1. The motion for rehearing is denied. The original opinion of this Court is withdrawn, and this modified opinion is substituted in its place.

¶2. Clay and Vicky Moss married on February 14, 1987, and separated on or about July 7, 2018. They had two children. On August 14, 2018, Vicky filed for divorce on the statutory ground of habitual cruel and inhuman treatment pursuant to Mississippi Code Annotated section 93-5-1 (Rev. 2018).

¶3. In her brief and at trial, Vicky stated that Clay habitually belittled and humiliated her throughout their thirty-year relationship. She testified that Clay controlled what she wore,

called her a "tramp" or "slut" when he deemed her clothing immodest, and inspected her clothing daily. Multiple times, Clay told Vicky that "you've dressed like a tramp our whole married life." According to Vicky, Clay would tell her to bend over to test if he could see her bra or cleavage before she went to work, and he often told her to change clothes. When he disapproved of her clothing, he stated, "[N]o self-respecting Christian would ever wear that." At one point, Vicky gave Clay a picture of herself in her nurse's uniform, and Clay called the photograph "appalling and insulting." Vicky testified that Clay shamed her for losing her virginity in high school and repeatedly accused her of adultery. In a 2017 note he wrote to Vicky threatening suicide, Clay questioned the paternity of their eldest daughter.

¶4.     According to Vicky's trial testimony, Clay also habitually criticized Vicky's completion of basic household tasks, including how she did the laundry, scooped the kitty litter, and changed their daughters' diapers. Vicky testified that Clay regularly called her "small-minded" and "idiotic" and told her that she was not a good role model for her children. Additionally, Vicky testified that Clay forced her to quit a women's softball league and isolated her from her friends.

¶5.     Vicky and Clay worked as Christian missionaries in Africa from 1990 to 1991, in Malaysia from 2003 to 2011, and in Indonesia for six months in 2008. In 2011, Vicky and other mission staff grew concerned with the intensity of Clay's relationship with a fifteen-year-old girl at the school. Clay constantly communicated with the child and ignored Vicky's requests for Clay to "leave her alone." Vicky testified that she "warned him . . . [he was] giving this girl too much attention." During this period, Clay "wanted different sexual

2

favors" from Vicky, began looking at pornography, and asked her to shave her pubic hair for the first time in their relationship.

¶6.     In 2011, the mission placed Clay on immediate leave due to complaints of an "inappropriate relationship/infatuation with a teenage girl." The mission cited Clay's "lack of boundaries and lack of understanding of the seriousness and inappropriateness of [his] interactions with a young woman." The mission required Vicky and Clay to receive marriage counseling "that leads you to be able to demonstrate commitment to marriage [and] growth in communication" and required "a significant period of stability and growth after counseling is completed" in order to return to international service. Clay and his family were told to make arrangements to leave immediately. The mission instructed Clay that he must refrain from communicating with any student and that he should not transport his children to or from school so as to avoid any student interaction. One day after being placed on leave, Clay flew to Australia without notifying Vicky or his children. As a result of Clay's conduct, the Mosses were forced to move back to the United States, and their children were uprooted from their school mid-year.

¶7.     In the years following, Vicky and Clay's relationship further deteriorated. Beginning in 2017, Clay and Vicky discussed separation. Clay sent Vicky a series of emails informing her that he would not agree to a divorce unless she denounced her Christianity or "admitted [she] was never a true Christian." He told her that "no authentic Christian gets a divorce" and called Vicky "a presumptuous sinner." Clay continued sending these emails after Vicky repeatedly asked him to stop. In his emails, Clay admitted that he had "crushed [Vicky's]

3

spirit" and that his conduct constituted "tough love." Vicky testified that during their separation, she observed Clay's car at the family home at night "hundreds of times" and stated that he knocked on her window in the middle of the night.

¶8. Between 2017 and 2018, Clay left Vicky three notes threatening suicide, including one entitled "Finishing the Job." In Clay's May 2017 suicide note, he asked Vicky to "help him decide how he was going to go about committing suicide." In another note, Clay wrote to Vicky, "Let [our children] know just before I pull the trigger, I will pray for your radical transformation to Christ." He suggested Vicky should not remarry after his death and stated that "I know from experience that you're not the wifely type." In his notes, he also told Vicky to make phone calls relating news of his suicide, told her to cancel his appointments, and asked her to explain the suicide to their children, saying he was putting "the ball in [Vicky's] court." After Vicky read one suicide note, Clay returned home later that day, stated that "I guess God doesn't want me to die today," and said he was going to get ready for church. In July 2018, after a suicide threat, Clay checked himself into St. Dominic Hospital and was released after one day.

¶9. In July 2018, Vicky's lawyer referred her to a counselor, Mary Barksdale. In 2018, Vicky's doctor prescribed her medication for depression, which Vicky took for a short period before stopping due to side effects.

¶10. Vicky filed for divorce based on habitual cruel and inhuman treatment on August 14, 2018. Clay filed his answer on September 21, 2018. At trial, Vicky testified that Clay's conduct made her anxious, made her cry uncontrollably, and resulted in her feeling worthless.

4

She also testified that her symptoms of stress led to picking at her eyelashes, as well as loss of sleep, chest pain, and headaches.

¶11. On December 14, 2020, the chancellor granted Vicky a divorce on the ground of habitual cruel and inhuman treatment. The chancellor stated that text communications between Clay and Vicky showed Clay's "incessant, constant humiliation, shame, [and] correction" of Vicky. Clay's behaviors of calling Vicky impure, his "constant, unfounded accusation of Mrs. Moss engaging in adulterous affairs" and questioning the paternity of his daughter were an attempt "to humiliate and shame Mrs. Moss," according to the chancellor. Referring to Clay's suicide notes, the chancellor stated that "the Court does not believe that [Clay's] suicide notes were authentic threats to commit suicide" but "veiled threats of manipulation." Additionally, the chancellor said that Clay's attacking Vicky's Christian faith and calling her "slut" or "tramp" were "mean-spirited and cruel." He also noted the "family humiliation" of Clay's being removed from the mission. The chancellor stated that Clay's leaving mid-meeting and fleeing to Australia showed "all kinds of signs of guilt" and concluded that based on the evidence, "I don't believe anything about . . . his version of what happened in Malaysia."

¶12. On appeal, Clay argues that the chancellor erred in granting Vicky a divorce on the ground of habitual cruel and inhuman treatment. He argues that Vicky failed to produce sufficient evidence to satisfy the standard. Clay also asserts claims concerning expert witness testimony and separate maintenance. Finding no error, we affirm.

**DISCUSSION**

5

## I. Standard of Proof for Habitual Cruel and Inhuman Treatment

¶13. Our scope of review is limited, overturning the "chancellor's determination only when the findings are manifestly wrong and there is no substantial supporting evidence." *Rakestraw v. Rakestraw*, 717 So. 2d 1284, 1287 (¶9) (Miss. Ct. App. 1998); *see also Lowrey v. Lowrey*, 25 So. 3d 274, 285 (¶26) (Miss. 2009) ("A chancellor's findings of fact will not be disturbed unless manifestly wrong or clearly erroneous.").

¶14. Habitual cruel and unusual treatment must be proved by a preponderance of the evidence. *Smith v. Smith*, 614 So. 2d 394, 396 (Miss. 1993). "If that standard is met to the chancellor's satisfaction, the judgment below will not be disturbed unless we find a manifest error of law or fact." *Bodne v. King*, 835 So. 2d 52, 58 (¶19) (Miss. 2003) (citing *Chaffin v. Chaffin*, 437 So. 2d 384, 386 (Miss. 1983)). To prove habitual cruelty, a party must show conduct that either:

> (1) endangers life, limb, or health, or creates a reasonable apprehension of such danger, rendering the relationship unsafe for the party seeking relief, or (2) is so unnatural and infamous as to make the marriage revolting to the nonoffending spouse and render it impossible for that spouse to discharge the duties of marriage, thus destroying the basis for its continuance.

*Harmon v. Harmon*, 141 So. 3d 37, 41 (¶14) (Miss. Ct. App. 2014) (quoting *Smith v. Smith*, 90 So. 3d 1259, 1262 (¶10) (Miss. Ct. App. 2011)).

¶15. "[A] finding of physical violence is not a prerequisite to establishing habitual cruel and inhuman treatment." *Jackson v. Jackson*, 922 So. 2d 53, 56 (¶4) (Miss. Ct. App. 2006) (citing *Fisher v. Fisher*, 771 So. 2d 364, 367 (¶10) (Miss. 2000)). "Mere unkindness, rudeness, petty indignities, frivolous quarrels, incompatibility or lack of affection are not

6

sufficient." *Bodne*, 835 So. 2d at 59 (¶23) (citing *Steen v. Steen*, 641 So. 2d 1167, 1170 (Miss. 1994)); *see also McKee v. Flynt*, 630 So. 2d 44, 48 (Miss. 1993). "On the other hand, habitual ill-founded accusations, threats and malicious sarcasm, insults and verbal abuse may cause such mental suffering as to destroy health and endanger the life of an innocent spouse." *Stone v. Stone*, 824 So. 2d 645, 646-47 (¶4) (Miss. Ct. App. 2002) (quoting *Holladay v. Holladay*, 776 So. 2d 662, 677 (¶64) (Miss. 2000)). A court may find that the habitually cruel standard is met when emotional abuse "falls 'along the lines of habitual ill-founded accusations, insults[,] and threats.'" *Johnson v. Johnson*, 281 So. 3d 70, 75 (¶22) (Miss. Ct. App. 2019) (quoting *Reed v. Reed*, 839 So. 2d 565, 570 (¶19) (Miss. Ct. App. 2003)).

¶16. In determining whether the habitual cruel and inhuman treatment standard is met, "[t]here is a dual focus on the conduct of the offending spouse and the impact of that conduct on the offended spouse." *Bodne*, 835 So. 2d at 59 (¶24). "The effect of the conduct on the offended spouse is determined by a subjective standard, which is to say that an attempt is made to weigh the likely effects of the conduct on the offended spouse, as opposed to a normative standard." *Id.* Courts consider "the frequency and severity of the conduct, and the impact on the offended spouse." *Harmon*, 141 So. 3d at 41 (¶15). In *Stone*, the chancellor found that "taking the Lord's name in vain" contributed to a showing of cruel and inhuman treatment because Mrs. Stone was "a woman of delicacy of sentiment." *Stone*, 824 So. 2d at 647 (¶5).

¶17. The offended spouse may show a negative impact through mental or physical symptoms. For example, in *Mitchell v. Mitchell*, the wife "sought counseling for the

7

psychological stress caused by the marriage [and] was given a prescription for antidepressant medication." *Mitchell v. Mitchell*, 823 So. 2d 568, 571 (¶12) (Miss. Ct. App. 2002). In *Rakestraw*, testimony from friends and family established that the wife experienced "persistent emotional stress" from her husband's conduct sufficient to "establish the necessary link between her husband's behavior and her own emotional deterioration which led to her leaving the marriage." *Rakestraw*, 717 So. 2d at 1288 (¶12).

¶18. In determining whether the habitual-cruel-and-inhuman-treatment standard is met, courts may take into consideration the totality of the offending spouse's conduct. "There are many kinds of acts such as wil[l]ful failure to support, verbal abuse, neglect, and the like which, if taken alone will not constitute cruelty, but when taken together will manifest a course of conduct as a whole which may amount to cruelty." *Savell v. Savell*, 240 So. 2d 628, 629-30 (Miss. 1970). "But if these combined acts manifest a course of revolting conduct, they may give rise to cruelty." *Harmon*, 141 So. 3d at 42 (¶15). "The offending spouse's conduct . . . must be shown to have been systematic and continuous." *Baggett v. Baggett*, 246 So. 3d 887, 892 (¶13) (Miss. Ct. App. 2017) (internal quotation marks omitted).

¶19. "[F]alse accusations of infidelity, made habitually over a long period of time without reasonable cause . . . constitute cruel and inhuman treatment." *Richard v. Richard*, 711 So. 2d 884, 889 (¶18) (Miss. 1998). Controlling behavior leading to social isolation may also contribute to a finding of habitual cruel and inhuman treatment. In *Robison v. Robison*, 722 So. 2d 601, 603 (¶6) (Miss. 1998), the chancellor considered the wife's testimony regarding the husband's "controlling nature, how [the husband] would restrict her social life to the

point of telling her who she could be friends with, what social functions she could attend, and where and under what circumstances she could go anywhere." The standard may be satisfied by "habitual or continuous behavior over a period of time, close in proximity to the separation, or continuing after a separation occurs." *Richard*, 711 So. 2d at 890 (¶23).

¶20. In *Stone*, the chancellor considered habitual yelling, angry outbursts, vile language, complaints about Mrs. Stone's weight, failure to show affection, and criticism of Mrs. Stone's handling of finances were sufficient, when taken together, to show habitual cruel and inhuman treatment. *Stone*, 824 So. 2d at 647 (¶5). The chancellor concluded that "[a]ll these instances, combined and considered in the totality of circumstances in a close case, constitute[d] behavior that equates to habitual cruel and inhuman treatment." *Id*. Likewise, in *Harmon*, the chancery court determined that the "cumulative effect of the degrading sexual behavior, cursing and yelling, habitual gambling, jealousy, and stalking, and the resulting negative effect to [the wife's] health amounted to habitual cruel and inhuman treatment." *Harmon*, 141 So. 3d at 42 (¶17).

¶21. Similar to the present case, the husband in *Rakestraw* "frequently belittled [the wife] before family and friends by referring to her as 'stupid' or 'ignorant.'" *Rakestraw*, 717 So. 2d at 1286 (¶4). Further, the husband once questioned the paternity of his daughter. *Id*. The court noted that the husband "spent many hours either sitting nearby in his parked vehicle or driving past the house, waiting for [his wife] and the girls to step outside. At one point his late[-]night knocks at her door and peeping through open windows caused [the wife] to fear for the safety of her family." *Id.* at 1286 (¶6). Taking into consideration the totality of the

9

husband's conduct, this Court held that "[b]ecause the whole of [the husband's] behavior was so consistently egregious over the entire 25[-]year relationship, we cannot fault the chancellor's opinion that this was one such situation." *Id.* at 1288 (¶10). Here, the chancellor referred to Clay's "incessant, constant humiliation, shame, [and] correction" of Vicky over the course of the relationship.

¶22. Clay argues that there is precedent for reversal in *Reed v. Reed*, 839 So. 2d 565 (Miss. Ct. App. 2003). However, we find *Reed* distinguishable from the current case. In *Reed*, the wife claimed that the habitual cruel and inhuman treatment only occurred during the last two months of her nineteen-year marriage. *Id.* at 569 (¶16). The wife also never indicated that she received any treatment for the stress she endured. *Id.* at 570 (¶24). In this case, Clay's conduct was continuous over the entirety of the marriage. Vicky described his cruel conduct beginning around the Mosses' wedding day and continuing over the course of their thirty-year marriage, and the chancellor referred to Clay's conduct as "incessant." Additionally, Vicky received medical and psychological treatment for her stress. Vicky was prescribed antidepressants and saw a counselor, and her daughters testified to her physical manifestations of anxiety. Although Clay argues that Vicky took the depression medication only for a short period, she stopped due to side effects rather than determining she did not need medication.

¶23. We also find this case is distinguishable from Clay's other frequently cited case, *Wangler v. Wangler*, 294 So. 3d 1138 (Miss. 2020). In *Wangler*, the chancellor found that the wife "failed to present adequate proof of habitual cruel and inhuman treatment." *Id.* at

10

1140 (¶5). In addition, her testimony frequently was misleading or contradictory. *Id.* at 1144-45 (¶¶24-29). At trial, despite alleging that late-night fights with her husband deprived her of sleep, the wife "offered no testimony to suggest that [her husband's] alleged criticism was the ultimate cause of her sleep deprivation," and she testified that she was losing sleep due to her infant daughter and twelve-hour shifts as an emergency room nurse. *Id.* at 1144 (¶¶19-20). The Mississippi Supreme Court stated that the wife's conflicting testimony regarding her allegations against her husband was "considered by the chancellor" in making his judgment. *Id.* at 1147 (¶38). Additionally, the wife testified that her husband had falsely accused her of infidelity only a few times toward the end of their relationship. *Id*. at 1144 (¶23). The supreme court determined that "[s]uch accusations made only 'a handful of times' over a short period of time do not amount to habitual cruel and inhuman treatment." *Id.*

¶24. "In a bench trial, the trial judge has sole authority to determine the credibility of the witnesses." *Bell v. Parker*, 563 So. 2d 594, 597 (Miss. 1990). That finding of credibility "is not qualified or limited." *Bodne*, 835 So. 2d at 58 (¶18). "Established precedent permits the chancellor, as the trier of fact, to evaluate the sufficiency of the proof based upon his assessment of the credibility of the witnesses and the weight he thinks properly ascribed to their testimony." *Rakestraw*, 717 So. 2d at 1287 (¶9). Where a chancellor makes a specific finding that one witness is credible, and no finding is made regarding the other witness's credibility, "[a]n entirely reasonable, if not inescapable, inference is that the testimony by and for [the witness deemed credible] should be given substantial weight, while [the other witness's] testimony should be given correspondingly less weight." *Bodne*, 835 So. 2d at 58

11

(¶18). "Once the trial judge has determined that the standard of proof has been met for granting a divorce on the ground of habitual cruel and inhuman treatment, we are not at liberty to disturb that finding unless we find manifest error of law or fact." *Richardson v. Richardson*, 856 So. 2d 426, 431 (¶23) (Miss. Ct. App. 2003).

¶25.    Here, the chancellor deemed Vicky's testimony credible and stated that Clay was "very self-advocating," had a "domineering-type persona," and engaged in "veiled threats of manipulation." The chancellor stated that he "believed Mrs. Moss more than Mr. Moss based on the proof." He also specified that he did not believe Clay's account of the events in Malaysia and stated that Clay's fleeing to Australia showed "indicia of guilt." Accordingly, the chancellor afforded more weight to Vicky's testimony. *See Bodne*, 835 So. 2d at 58 (¶18). Additionally, as previously stated, Vicky received medical treatment for her symptoms of anxiety and depression, and her testimony was corroborated by her family. As in other cases where the court found habitually cruel treatment, Clay engaged in some type of cruel conduct on a daily basis. The chancellor stated that Clay's behaviors of cruelty and humiliation were continuous and "incessant."

¶26.    Even when a single action would not constitute habitual cruel and inhuman treatment, the totality of an offending spouse's actions may satisfy the standard. *Savell*, 240 So. 2d at 629. Although Vicky's separate claims may not satisfy the standard on their own, we find that the chancellor did not err in holding that Clay's conduct, in totality, constituted habitual cruel and inhuman treatment. According to testimony deemed credible by the chancellor, Clay isolated Vicky from friends and social activities, verbally degraded her appearance,

habitually insulted her intelligence and values, and accused her of adultery throughout the relationship. *See Harmon*, 141 So. 3d at 42 (¶17); *Stone*, 824 So. 2d at 647 (¶5); *Rakestraw*, 717 So. 2d at 1286 (¶¶3-4). Additionally, credible testimony indicated that after the separation, Clay made Vicky and the children fearful by regularly visiting the family home and knocking on windows in the middle of the night. *See Rakestraw*, 717 So. 2d at 1286 (¶6) (finding a spouse's late-night visits to the family home contributed to satisfaction of the habitual cruelty standard). Again, the chancellor referred to Clay's conduct as habitual and "incessant." Clay also repeatedly told Vicky she was "not a true Christian" and refused to agree to the divorce unless Vicky renounced her Christian faith. The chancellor found Clay's attacking of Vicky's faith as a "bargaining tool to get a divorce . . . [was] downright mean-spirited and cruel." The chancellor also properly considered Clay's inappropriate relationship with a fifteen-year-old Malaysian girl and the effect of this conduct on the family.

¶27. Finally, the chancellor deemed Clay's notes to Vicky threatening suicide to be manipulative when considered in context. We find that Clay's conduct after the separation, including his visits to the house late at night and his suicide notes, were properly considered in making a determination of habitual cruel and inhuman treatment. These acts were properly considered because "habitual or continuous behavior . . . continuing after a separation occurs" may contribute to a finding of habitual cruel and inhuman treatment. *Richard*, 711 So. 2d at 890 (¶23). The chancellor considered the language of the notes, as well as Vicky's testimony regarding Clay's conduct before and after the notes were written,

13

in determining that the threats were used as manipulation. Therefore, we find there was substantial evidence to support the chancellor's granting of the divorce on the ground of habitual cruel and inhuman treatment.

## II.     Admissibility of Expert Witness Testimony

¶28.    Clay argues that the chancellor abused his discretion in allowing Vicky's counselor Mary Barksdale to testify as an expert witness because Vicky did not disclose the word "trichotillomania" in her interrogatory response for Barksdale's expert testimony.

¶29.    "The standard of review for the admission or exclusion of evidence, such as expert testimony, is abuse of discretion." *Thompson v. Holliman*, 283 So. 3d 718, 721 (¶10) (Miss. 2019). Thus, unless "the trial court abused its judicial discretion in allowing or disallowing evidence so as to prejudice a party in a civil case, or the accused in a criminal case," the trial court's ruling will be affirmed. *Jones v. State*, 918 So. 2d 1220, 1223 (¶9) (Miss. 2005).

¶30.    Mississippi Rule of Civil Procedure 26(b)(4)(A)(i) prevents "trial by ambush." *See Warren v. Sandoz Pharms. Corp.*, 783 So. 2d 735, 742 (¶16) (Miss. Ct. App. 2000). "Under this Mississippi rule[,] if an answer to an interrogatory regarding an expert witness who will testify at trial is deemed insufficient by opposing counsel, some means of notice of such insufficiency must be given to the opposing party in order to let them know that additional information is desired." *Id*. (quoting *State Highway Comm'n v. Havard*, 508 So. 2d 1099, 1104 (Miss. 1987)).

¶31.    *Holladay* applies these concepts to a chancery court proceeding. The supreme court stated that although the answers must prevent "trial by ambush[,] . . . the entire case is not

14

required to be contained in the answer." *Holladay*, 776 So. 2d at 672 (¶44). The supreme

court further elaborated:

> Nothing in the case law submitted by counsel or the pertinent procedural rule
> suggests that an expert will be restricted to testify only to the literal words
> from their opinion and a summary of the related grounds. The very use of the
> words "substance" and "summary" show[s] that the Rule does not require an
> expert to state solely the words of their compiled reports. Such a view would
> place form over substance, and in a chancery court proceeding, we hold that
> a ruling to that effect is an abuse of discretion.

*Id.*

¶32.    In his argument, Clay cites *Bailey Lumber & Supply Co. v. Robinson*, 98 So. 3d 986

(Miss. 2012). In *Bailey Lumber*, the supreme court held that the trial court erred in allowing

an expert witness to testify about future medical treatment and expenses because defense

counsel was not provided with the "substance of [his] facts and opinions" on that subject

prior to trial. *Id.* at 998 (¶31). There, the expert witness provided a monetary figure of future

medical expenses and medication at trial without having first disclosed the monetary figure

or the measures he used to calculate it in his interrogatory response. *Id.* Further, the

supreme court stated:

> Because it is unclear from the jury verdict form whether future medical
> treatment and expenses were considered by the jury and included in the award,
> it is possible that allowing this testimony was harmless error. However, it was
> an error nonetheless and could have bolstered Dr. McNair's credibility before
> the jury, compounding the problem of allowing his unqualified and unreliable
> testimony as to causation.

*Id.* at 998 (¶31). Because the expert witness's testimony in *Bailey Lumber* was essential for

the jury to calculate damages and was thus necessary for defense counsel, we find that case

distinguishable.

¶33. However, in the current case, the chancellor deemed Vicky to be a credible witness, and Clay was privy to Vicky's testimony regarding her physical and mental health. The physical and mental symptoms that Barksdale described were the very same symptoms Vicky testified to at trial. Additionally, in making his decision, the chancellor stated that Barksdale's testimony "was not even considered in any of the reasons why [Vicky] was entitled to a divorce on the grounds of habitual cruel and inhuman treatment with the carving out of the exception of the trichotillomania that was brought up by the expert." We need not speculate about the impact the expert witness's testimony had on the chancellor's decision because the chancellor provided his reasoning.

¶34. In this case, Clay's interrogatory requested the "subject matter" for which each identified expert witness was expected to testify, the "substance of the facts and opinions to which each expert is expected to testify, [and] the summary of the grounds for each opinion . . . ." Vicky's answer in regard to Barksdale, her counselor, is as follows:

> Ms. Barksdale will testify from multiple counseling sessions with Vicky, the effect of Clay's habitually controlling, obsessive, oppressive, and cruel behavior has had on Vicky's emotional state and well[-]being. Ms. Barksdale will testify that to a reasonable degree of certainty that based upon the conduct reported to her by Vicky regarding Clay, and based upon the impact of same, that it is a danger to Vicky's health to remain in the marriage and that it is impossible for Vicky to remain in the marriage, due to Clay's habitual cruel and inhuman treatment.

¶35. We find that the current case does not constitute "trial by ambush." Clay and his counsel had sufficient notice to depose Barksdale prior to trial but failed to do so. Vicky's interrogatory response stated that Barksdale's testimony would be based upon the "conduct

16

reported to her by Vicky." Barksdale's testimony did not diverge from the "effect of Clay's habitually controlling, obsessive, oppressive, and cruel behavior has had on Vicky's emotional state and well[-]being," and her opinion that "it is a danger to Vicky's health to remain in the marriage." Vicky herself testified that she was "anxious," "cr[ied] uncontrollably," had "feeling[s] of worthlessness," "pick[ed her] eyelashes out," had "chest pain," experienced periodic "loss of sleep," "neck and back pain, [and] headaches."

¶36. Further, Clay was on notice of the specific conduct reported by Barksdale because Vicky testified to it. Although Vicky had not used the technical term "trichotillomania," she described the pulling of her eyelashes. Barksdale's testimony was that trichotillomania is when a person "pulls out their eyelashes or eyebrows, sometimes their hair." The chancellor noted that he personally observed Vicky pulling her eyelashes during the trial proceedings.

¶37. The chancellor stated that he did not rely on or "even consider" Barksdale's testimony, aside from the testimony on trichotillomania. The chancellor deemed Vicky and her daughters to be credible witnesses, and it was clear that his judgment was not based upon Barksdale's statements. Mississippi Code section 93-5-1 (Rev. 2021) provides that "spousal domestic abuse may be established through the reliable testimony of a single credible witness, who may be the injured party." The chancellor heard Vicky's testimony and deemed it credible. Further, the chancellor heard testimony from Vicky's daughters, which corroborated the effects of Clay's conduct, and deemed their testimony credible. Habitual cruelty could have been established in this case without Barksdale's testimony. Accordingly, we find the chancellor's allowing Barksdale to testify was not an abuse of discretion.

17

### III. Counterclaim for Separate Maintenance

¶38. Clay argues that his counterclaim for separate maintenance should be remanded because the chancellor erred in granting Vicky a divorce. "We review a chancellor's award of separate maintenance for an abuse of discretion." *McCarley v. McCarley*, 270 So. 3d 218, 222 (¶21) (Miss. Ct. App. 2018). However, a claim for separate maintenance is "no longer proper" when a divorce has previously been granted. *Weiss v. Weiss*, 579 So. 2d 539, 541 (Miss. 1991). Thus, when a divorce has properly been granted, a claim for separate maintenance is a moot issue. *G.B.W. v. E.R.W.*, 9 So. 3d 1200, 1208 (¶15) (Miss. Ct. App. 2009). Because we hold that the chancellor properly granted Vicky a divorce on the fault ground of habitual cruel and inhuman treatment, the issue of separate maintenance is moot.

### CONCLUSION

¶39. Based upon the foregoing, we affirm the chancellor's judgment granting a divorce on the fault ground of habitual cruel and inhuman treatment. Because the divorce was proper, we affirm the chancellor's denial of separate maintenance.

¶40. **AFFIRMED.**

**CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**